THE HOUSING AUTHORITY OF THE CITY OF LITTLE ROCK, ARKANSAS *v.* FORCUM-LANNOM, INC.

5-5227                                      454 S. W. 2d 101

Opinion delivered May 18, 1970

[Rehearing denied June 15, 1970.]

*Smith, Williams, Friday & Bowen,* for appellant.

*Ashley, Malone, Ashley & Lawson* and *Catlett & Henderson,* for appellee.

J. FRED JONES, Justice. This is an appeal by the Housing Authority of the City of Little Rock from an adverse decision of the Pulaski County Circuit Court in favor of the appellee contractor, Forcum-Lannom, Inc. The appellee contractor sued the Housing Authority for delay damages in the amount of $279,708.81, allegedly caused by the Housing Authority's breach of contractual duties in the preparation of work area ahead of work to be performed by the appellee. The Housing Authority counterclaimed for $53,500 in liquidated damages for delay under the terms of the contract. Judgment was rendered for the appellee contractor and included damage in the amount of $75,000. On appeal to this court the Housing Authority relies on the following points for reversal:

"As a matter of law appellant was under no contractual obligation to guarantee timely adjustment of utilities.

There is no substantial evidence that appellant failed to fulfill its contractual obligations.

The court erred in admitting evidence of damages allegedly caused by delays.

The court erred in allowing appellee to recover and in denying liquidated damages."

The facts of record appear as follows: The appellee contractor was the successful low bidder on a Housing Authority construction project for slum clearance and urban renewal development in Little Rock. The contractor of a storm sewer system. It also called for street surfacing, as well as for the construction of curbs and gutters. The contract price finally agreed upon was $665,777.26. The work was to be completed within 360 calendar days from July 26, 1964, and the contract provided for liquidated damages of $100 per day for delay in completion.

The provisions of the contract were many and detailed. It charged the contractor with the responsibility of laying out its own work, and with the responsibility for all work executed by it under the contract. The contract also provides that the contractor shall verify all figures and elevations before proceeding with the work and will be held responsible for any error resulting from its failure to do so. This litigation, however, arose primarily under § 409 of the contract, which reads as follows:

"WORK BY OTHERS

The removal of existing utilities required to permit an orderly prosecution of the work will be done by local agencies, unless otherwise shown on the plans. Whenever power, telephone or telegraph poles, conduit, pipe line, sewer or other utility encountered must be removed or relocated to complete the project, the Contractor shall notify the Engineer who will notify the local Owner and attempt to get prompt action. The Contractor will cooperate with the local utility owners in maintaining service to excluded areas within the Project limits and contiguous to the Project."

The appellee alleged, in its complaint, that the

appellant breached its contract in that it failed to warn appellee of any delaying condition at bidding time or before commencing work; failed to provide the appellee with contiguous segments of right-of-way free of all obstructing utilities so as to permit orderly prosecution of the work; failed to provide engineering information such as street elevations; failed to grant proper time extension which resulted in 530 separate delays; that as a consequence ot appellant's breach, the contractor was required to spend large sums of money for barricades, lights and so forth to protect the area. The appellee contractor also claimed interest on delinquent payments.

The Housing Authority denied the allegations of the contractor and affirmatively alleged that the contract provided that when utilities were encountered, appellee was to immediately notify the engineers who would contact the local agencies for removal and to facilitate same; that the contractor was to furnish day work schedules which it totally failed to do, and that such failure was a breach of the contractor's obligation under the contract. The Housing Authority also alleged that the contractor further breached the contract by failing to set specific points and establish grades and alinements for construction; failed to verify all figures and elevations, and failed to give the Housing Authority 10 days' notice in writing of any cause in delay, as it was required to do under the contract.

If the contractor is entitled to a judgment for damages it sustained by reason of delay in the performance of the contract brought about by the Housing Authority and its engineers, it only follows that the Housing Authority would not be entitled to a judgment against the contractor for liquidated damages for such delay. We have examined the voluminous record in this case and have concluded that there is substantial evidence to support the judgment of the trial court. The trial court has favored us with a comprehensive written memorandum opinion, and it so nearly coincides with our own view as it relates to the substantial nature of

the evidence, we feel justified in quoting it in full, as follows:

> "This case was well prepared and tried. Testimony of the witnesses and the introduction of numerous meaningful exhibits required a full three-day nonjury trial. The verbal testimony offered was of such equal and convincing character to cause a decision, in the main, to be based on a careful study and analysis of the many exhibits made a part of the record.
>
> To some extent even the exhibits sustained the conflicting position of the respective parties, but this Court concludes that they swing the scales of justice toward plaintiff with regard to some of its claims and in favor of the defendant on some of the claims urged by plaintiff.
>
> At the outset let it be understood that this Court recognizes the premise that in any construction contract of this magnitude it should be anticipated that usual and customary delays will be encountered and that a contractor bidding on such a job must contemplate such usual and customary delays. Plaintiff broke down their claims into six classifications and overall presented approximately two hundred twenty-six separate and distinct claims for damage. With regard to initial Claim No. 1 pertaining to a re-design of multiplate covers, same is disallowed because it is felt plaintiff failed to meet its burden of proof. Furthermore, all of plaintiff's claim relating to curb inlet and junction box construction, flares and barricades and interest on delinquent payments of partial pay estimates under the contract are disallowed even though plaintiff presented a rather strong and convincing case on these items. However, in analyzing the proof, this Court is convinced that plaintiff had no justifiable reason to believe that the work could proceed in an orderly manner which would permit the placing of 'tops' on such junction boxes almost simultan-

eously with the construction of such boxes. It is recognized that plaintiff suffered delay and the expense of moving back and forth to complete such tops, but again in this connection, the proof seems to indicate that such procedure is normal and to be expected.

Omitting the aforementioned claims, there still remains for determination many alleged breaches of contract. It would be absolutely impossible for this Court to discuss the evidence pertaining to each individual claim and very candidly no effort will be made in this memorandum to enter into such discussion or analysis. Generally speaking it can be said that from the very inception of the work the plaintiff experienced difficulties which appear under the proof to be unusual, abnormal and unreasonable. There can be no doubt but what the initial work was commenced at a point where all parties agreed the work should begin; that delays were immediately experienced by reason of obstacles, obstructions and hinderances beyond the control of plaintiff. The exhibits indicate that complaints were being made by the contractor early after commencement of work and much credence is given to these complaints because it is felt that same certainly were not registered with the view of preparing for litigation. It appears to this Court that there was a lack of communication, a lack of cooperation and coordination and that all of the blame for these deficiencies cannot be placed on the contractor.

Grievances were presented as to availability of right of way; of proper grade; of the unusual and numerous underground utilities that had not been removed. The Housing Authority, through its engineers, found much fault with plaintiff's cleaning process; its delays in patching up streets or cuts in streets so that traffic could move more rapidly. Finally, the Housing Authority issued a stop order dated February 10, 1965 on all work other than

that outlined in such order. Same remained in effect until March 11, 1965. Too, at the insistence of the defendant the plaintiff was forced to accelerate its work and this added to plaintiff's financial burden. In general, the Court finds that there were numerous and disrupting delays and suspensions, and that the contractor was never in a position to plan and follow any normal sequence in which the work was to be done on the project; that such delays and suspensions of work in excess of those which a contractor could or should reasonably anticipate as being normal, usual and customary in the performance of a contract of this nature. Also the Court specifically finds that the defendant was under a duty of cooperation to do whatever was necessary in the project area to enable plaintiff to perform its contract in an orderly manner and that defendant breached this duty in that it failed to use its best efforts to secure the removal of the utilities, underground and overhead, and that such failure unreasonably hindered and delayed the contractor in the performance of the contract. This breach to some extent can be explained or justified on the premise that this was a highly populated area and the interest of the citizens in the vicinity must be protected. Even so, it is not felt that this plaintiff should be required to bear all of the loss. Near the end of the contract or at the conclusion thereof, plaintiff presented its claims to officials of the Housing Authority. It is evident from the record that such claims as presented by plaintiff raised issues which gave the defendant some concern. These claims ran parallel to the ones presented in this Court and included requests for allowances relating to extensions of time by reason of obstructions and weather conditions. After an exhaustive study such claims as made by plaintiff were rejected.

At the trial of this case plaintiff presented claims totaling approximately $285,000. After disallowing the claims mentioned earlier in this memorandum

and after reducing all of plaintiff's other claims for alleged damage, substantially it is the judgment of this Court that plaintiff should recover, as damages, a sum of $75,000 from the defendant.

In addition to the $75,000 awarded plaintiff, the Court finds that the Cross-Complaint of defendant is without merit. It is not believed the defendant took very seriously its position relative to liquidated damages; that on account of many problems presented to plaintiff in the performance of its contract, including unfavorable weather, it was not the intention of the Housing Authority to enforce the provision of the contract as to liquidated damages; that such claim was only injected into this action as a defense to plaintiff's claims. Therefore, plaintiff is also entitled to receive from the defendant the amount withheld by it which the Court understands to be $53,094.67."

The contract was entered into by the parties on July 3, 1964, and notice to proceed on the contract was issued on July 29, 1964. This entire litigation apparently stemmed from delay on the part of the contractor in completing various phases of the contract, and the delay on the part of the Housing Authority in obtaining the removal of public utilities from the area to be worked on. The contractor blamed the Housing Authority for the delay, and the Housing Authority blamed the contractor. The difficulty arose immediately following notice to proceed and both parties continued to chafe under the delays which each blamed on the other, until the contract was finally completed.

The first delay of record was apparently occasioned by a redesign of pipe which was originally scheduled for delivery during the week of July 20, 1964, but was actually received on August 25, 1964. On August 3, 1964, the contractor wrote a letter to the Housing Authority engineers stating, in part, as follows:

"This letter is to advise you that the start of installation of the 7' 11" X 5' 7" Multiplate Culvert from Station 6+69.60 to Station 11+64 will be delayed until approximately August 17th, 1964.

This delay is caused due to information received from Armco that a re-design in the length of pipe sections has caused a complete change in their fabrication and delivery schedule of this item. . ."

The chaotic condition in regard to the lack of communication between the Housing Authority and the contractor became worse, rather than better, and resulted in numerous transmissions between the two. As an example, on November 6, 1964, the contractor requested an extension of time in a letter stating, in part, as follows:

"We further request that a ten day extension of time be granted to cover the delays in re-laying and re-locating lines mentioned herein, as well as delays caused due to the necessity of waiting for the City Water Department and the Arkansas-Louisiana Gas Company to remove their utility lines to allow proper installation of the Storm Sewer System."

And again on December 10, 1964, the contractor wrote to the engineers as follows:

"As you are aware there are some 224 manholes, drop inlets, and catch basins in connection with the storm drainage system on this project. We are being placed in a very awkward position and being criticized for the incompletion of these units from several different agencies. We are also incurring considerable expense beyond the scope of the contract, for night watchmen, placing and maintaining flares, barricades and lights, which we intend to file for reimbursement for. We would like very much to eliminate this cost and the confusion which is being caused by not being able to complete these units as they are reached. Therefore,

we urge you to establish immediately some system for establishing grades so that these units can be completed. If this is done considerable clean up can be completed and hazardous driving conditions eliminated. I do not feel that it was the original intent of the contract for the contractor to build these units in three parts as is now the case. We understand that the Housing Authority has been criticizing our company for the lack of clean up. We request that you advise them that a considerable amount of this clean up could be accomplished and would have been accomplished had we been given the grades for these structures as construction was progressing."

On February 10, 1965, the Housing Authority temporarily suspended the work and advised the contractor that the order was made necessary due to improper construction sequence and lack of protection to the work already installed; failure to make periodical clean up during the progress of the work; and failure to provide adequate workmen, tools, and equipment for the amount of work under progress.

The suspension order was released on March 11, 1965, but after receipt of the suspension order, the contractor, on February 12, responded by letter stating, in part, as follows:

"We also wish to advise that the stated reasons for the action on the part of your Engineers are wholly unfounded in fact. On the contrary, we have been and are now being delayed on account of the failure of your Engineers to perform the necessary engineering services in a timely manner to permit orderly and efficient progress in our performance of the work. Further, we have sustained additional delays which are continuing on account of your failure to furnish us rights of way in a timely manner. For all of these delays, we give you notice that we have sustained and continue to sustain damages for which we will make claim

when the amount thereof has been ascertained.

On the basis of all of the above delaying circumstances, we request appropriate time extensions which shall be in addition to our claim for damages.

You have in the past and are presently withholding payment of certain periodical estimates which have been due for some time. You have furnished us no valid reason under the terms of the Contract for withholding these payments, and we further notify you that we are sustaining damages on this account. We insist that all periodical estimates presently due and unpaid under the Contract be paid immediately; and in the futute, that these estimates be paid promptly as required under the terms of the Contract. * * *"

On March 19, 1965, the contractor notified the engineers that grades for streets and elevations for top inlets previously requested had not been furnished, and noted that the right-of-way was lacking for all traffic diverters. This letter also complained as follows:

"We also would like to mention that, although your letter of March 18, 1965, states that certain utilities have been removed or are being removed, that in several instances the new utilities have been installed but the old ones have not been removed which does not clear the intersection for construction."

On May 18, 1965, the Housing Authority wrote the contractor as follows:

"It has become increasingly apparent that the progress of the work is lagging in this project and we feel that it is necessary to emphasize the need to accelerate the construction in order to meet the contract deadline."

The contractor replied to the May 18, 1965, letter as follows:

"* * * In this entire area of 13 blocks, only three are free of interference. We have no control or power to expedite, and this work must be done if we are to complete. The same is true of other sections of the Project. We again state if the stops and interferences are removed from our path ahead of time, we can accelerate construction.

In reference to the by-pass, had not instructions been given to our grader operator to cut the curb ledges out, we would be 100% further along. This one mistaken order has caused a minimum delay of three weeks to the construction of the by-pass. . ."

The appellant Housing Authority continued to complain about the delay and continued to suggest that the contractor increase his work force, and the appellee contractor continued to complain about the delay in having to move his work force from place to place throughout the entire project while waiting for the appellant to obtain right-of-ways clear of utility obstructions.

Mr. George Millar, Jr., Executive Director of the Housing Authority, testified as to the financial participation in the project by the city and federal government. Mr. James L. Phillips, Supervisor of Design Engineering for the resident engineers representing the Housing Authority, testified that he received the first work program schedule sometime after the 17th of September, 1964. Most of Mr. Phillips' testimony was directed toward the failure of the contractor to furnish work schedules so that right-of-ways could be furnished free of obstructions ahead of the construction, and none of his testimony was directed to what efforts, if any, the Housing Authority made in furnishing right-of-ways clear of utility obstructions after it did receive, or knew of, the contractor's work schedule, and after it received the complaints made by the contractor. In other words,

the Housing Authority directed most of its proof to its counterclaim for liquidated damages for delay, and did not assume its obligation of going forward with the proof in an effort to show what it did, if anything, in obtaining the removal of utilities in response to the numerous complaints made by the contractor.

The project was finally completed on February 9, 1966, and was accepted by the Housing Authority. The appellee offered considerable evidence tending to prove that it was forced to skip around over the entire project, thereby losing time and incurring expense in moving from one area to another, because the Housing Authority had not carried out its agreement in obtaining the removal of public utility lines, poles and equipment ahead of the construction in an orderly manner. The Housing Authority offered no proof at all as to what efforts it made, if any, in attempting to remedy the complaints made by the contractor as to the conditions causing the expense, lost time and delay complained of by the contractor, in performing its work under the contract. The Housing Authority simply contends that it was unable to arrange for the removal of utilities ahead of the contractor because the contractor failed to furnish a proper schedule of its intended operation. The conflicting evidence on these adverse contentions was submitted to the trial court sitting as a jury, and we do not disturb a trial court's decision under such circumstances if there is any substantial evidence to support it. *Ark. La. Gas Co.* v. *Wood,* 240 Ark. 948, 403 S. W. 2d 54.

It appears from the record that by mutual agreement, the work was started at the lowest point and was to proceed upgrade from the starting point in an orderly manner. It also appears from the record that when the contractor would specifically complain about *obstructions causing delay in completion and resulting damage in additional cost,* the Housing Authority, or its engineers, would respond only with a denial that the situation complained of existed, or with a sugges-

tion as to how the contractor might remedy the situation, or avoid its consequences.

The judgment of the trial court is affirmed.

FOGLEMAN, J., dissents in part.

JOHN A. FOGLEMAN, Justice, dissenting. I concur with the result reached by the majority insofar as questions pertaining to the substantiality of the evidence supporting the findings of the circuit court as to the liability of appellee are concerned.

However, I am unable to say that the claim of appellee for damages for the delays due to utility obstructions is properly supported. The claim was submitted to appellant upon the basis of a statement made up by appellee's superintendent Hubbell after the completion of the work, partly from daily reports of various foremen and partly from his own notes made on the job weekly. None of the sources of his information used in compiling the claim was available at the trial. The claim was broken down into individual items related to particular interferences with work progress. The costs for labor, equipment and "supervisory equipment" for moving away from the point where an obstruction was encountered were arrived at by an estimate made by Hubbell at the time the claim was prepared for presentation. None of the information as to work time lost or the distance moved on these occasions was recorded in any of the background sources utilized by Hubbell. It appears that each individual foreman would note the fact that an obstruction had been struck in his time book with no other information except the location at which his crew happened to be working on the succeeding day. Hubbell claimed that the minimum time loss ranged from a half day to a day. Hubbell wouldn't know the distance a crew or the equipment was moved in any instance, or the time required. Hubbell did claim to have personal knowledge of losses on certain occasions amounting to a total of $49,593.22, based upon his time and cost estimates.

Max Mehlburger, an engineer called as an expert witness by appellee, was unable to give any estimate of time lost because of work stoppages attributable to obstructions by utility facilities in the right-of-way. He indicated that the amount of time lost was dependent upon various factors, among which were distance moved in order to resume work, potential for continued full utilization of machinery and the time interruption of work forces while a new job site was being located and forces were being transferred. The best estimate he gave on a one-block move ranged from ten minutes to an hour or two. Even then it is not clear whether he included time lag in getting a crew productively employed after the move.

Ray Davis, a foreman for appellee, testified that on four or five occasions his crew would only skip 20 feet before continuing their work. Other moves were one block and still others two or three blocks. The time elapsed before return, in his recollection, ranged from a day to two or three weeks. The notes kept by him did not reveal where he moved, but he indicated that daily reports might disclose some of this information. He estimated the minimum time loss on a move to one-half day.

Hubbell's estimates were admitted over the objection of appellant. Except for those items of which he claimed to have personal knowledge, his testimony could not have been the basis of anything except speculation and conjecture. Even those estimates were not based upon the size of the work force involved, the equipment moved or any other identifiable factor. Hubbell simply applied his "rule of thumb." Several of his estimates of costs running in the hundreds of dollars on particular stoppages were identical to the odd penny. I have been unable to find any total of his estimates of damages well documented enough to support an allowance of $75,000 in damages.

Although I feel that a work stoppage from February 10, 1965, to March 11, 1965, ordered by appellant was

unauthorized, I am unable to find evidence of appellee's damage arising from this breach.

I agree that there is substantial evidence to support the trial court's finding that appellee should not be liable for liquidated damages. Appellant's long delay and comprehensive investigation before denying appellee's claims is some indication that this is not a case for allowance of liquidated damages for delay. There was also a failure to show any relationship between the actual damages sustained and the daily amount specified.

I would reverse the judgment and remand the case for a new trial, or reduce the judgment to $102,628.59[1], the maximum amount for which I think it might be said that there is substantial support, if appellee is willing to enter a remittitur to that amount.

---

[1]This is the sum of $53,094.67 retained as liquidated damages and $49,533.92 upon delay claims asserted by Hubbell.