200 N.J. Super. 251 (1985)
491 A.2d 49
CENTRAL STEEL DRUM COMPANY, PLAINTIFF-APPELLANT,
v.
GOLD COOPERAGE, INC., DEFENDANTS-RESPONDENTS. and SHEA & GOULD, DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued February 21, 1985.
Decided April 18, 1985.
*252 Before Judges MATTHEWS, FURMAN and HAVEY.
Stuart G. Brecher argued the cause for appellant (Brach, Eichler, Rosenberg, Silver, Bernstein, Hammer & Gladstone, attorneys; H. Neil Broder, of counsel; Stuart G. Brecher and Neil H. Broder on the brief).
Albert Burstein argued the cause for respondent (Rosen, Gelman & Weiss, attorneys; Jack F. Trope on the brief).
The opinion of the court was delivered by MATTHEWS, P.J.A.D.
Plaintiff appeals from a judgment which permits defendant Gold Cooperage, Inc. to retain $50,000 since plaintiff breached an agreement to purchase defendant's assets. The contract of *253 sale included a liquidated damage clause which provided for the forfeiture of that sum in the event plaintiff failed to complete the purchase.
The following was stipulated by the parties:
One, Central Steel Drum Company deposited the sum of $50,000 consistent with its obligation and responsibility under section number 2.01(A) of the purchase agreement dated as of December 29, 1981. Two, the attorneys for the seller, Shea and Gould, who were escrow agents under the terms of the purchase agreement dated as of December 29, 1981, released and paid to Gold Cooperage, Inc., the sum of $50,000. Three, the closing date of March 2, 1982, pursuant to section number 3.01 of the purchase agreement dated as of December 29, 1981 was adjourned upon consent to March 9, 1982 and no closing occurred under the terms and conditions of the purchase agreement dated as of December 29, 1981 or under any other agreement or understanding between Gold Cooperage, Inc. and Central Steel Drum Company.
Defendant and plaintiff were competitors, although the work performed by the two companies was not the same. Plaintiff reconditioned "open head" drums, which involved the burning or blasting of a drum; defendant reconditioned primarily closed-head drums, infrequently working on open-head drums.
During the summer of 1981, plaintiff became interested in purchasing defendant's business. Jeffrey Skuraton, one of plaintiff's owners, began negotiating with defendant on behalf of plaintiff for the purchase. Skuraton did most of the negotiating for plaintiff; Alan Fisher, a partner to Skuraton, also participated. Sol and Milton Gold negotiated for defendant.
A contract was prepared under which Skuraton, personally, was the named buyer of defendant's assets since his associates did not wish to continue negotiations. Subsequently, Skuraton's associates decided to acquire defendant's assets through plaintiff. Plaintiff was unrepresented by counsel until an oral understanding was reached with defendant, at which time counsel was retained and continuously represented plaintiff through March 9, 1982. Counsel drew up the agreement.
A total purchase price of $650,000 was specified, $600,000 of the purchase price to be commercially financed. Section 2.01(A) of the agreement provided that $50,000, paid upon execution of *254 the purchase agreement, would be held in escrow until closing. Skuraton denied ever discussing the amount of the deposit, specifically denying knowledge of its computation.
The $650,000 price had been agreed to during the summer of 1981 and was an arbitrary figure. Skuraton determined the value of defendant's assets by assessing its plant, equipment and approximate business volume. Skuraton inspected the machinery and equipment listed in section 1.01 of the agreement and was satisfied.
... Seller agrees that of the entire purchase price, SIX HUNDRED FORTY-NINE THOUSAND NINE HUNDRED ($649,900.00) DOLLARS is to be allocated to the equipment being purchased and sold hereunder; and that no portion of said price in excess of ONE HUNDRED ($100.00) DOLLARS is being allocated to Seller's name and the accounts of the Seller.
Skuraton testified that the allocation of $649,900 to the equipment being purchased was made strictly for tax purposes on counsel's advice. This amount was greater than the actual value of the machinery and equipment. Plaintiff, however, had no intention of using any of defendant's machinery; it was going to try to sell it. Hence, plaintiff viewed this acquisition as a buy out of one competitor, purchasing only its accounts.
Section 11 of the agreement provided:
If the purchase and sale contemplated by this Agreement is not consummated as hereinbefore set forth in this Agreement for any reason which is not the fault of the Seller or an act of God, then and in such event, the sum of FIFTY THOUSAND ($50,000.00) DOLLARS, which was paid to Shea & Gould, as set forth in Section 2.08, shall be delivered to the Seller as liquidated damages, and neither party shall have any further rights against the other.
Section 4.09 recited that for the 11-month period ending November 30, 1981 defendant sold 132,980 reconditioned open-head drums, 95,678 reconditioned closed-head drums, and 28,676 tallow drums. For this period the dollar value of these sales aggregated to no less than $2,886,500. Skuraton testified that section 4.09 had been inserted for plaintiff's benefit in order to determine the impact defendant's departure would have on the business.
*255 Under section 12.05 defendant covenanted to conduct its business "in the ordinary course" "pending closing of" the agreement. Skuraton had discussed this provision with both plaintiff's counsel and the Golds. He testified that from the beginning of the negotiations in the summer of 1981 his concern was with defendant maintaining business volume. The Golds assured him they would not let the business slack. Skuraton denied, however, having had any role in inserting section 12.05 in the agreement.
Robert Ruben was a New York attorney affiliated with Shea & Gould, defendant's counsel. To the best of his knowledge section 12.05 had been contained in the original draft of the agreement and had never been changed. He had never discussed it with counsel for plaintiff or objected to its presence. Ruben believed that the Golds understood that they were to continue to operate their business in the same fashion as it had always been operating.
The contract was signed sometime in January 1982. At that time Skuraton made demand for a representation that defendant's volume of sales would continue until the closing date. The Golds told him that they would continue to operate their business in the ordinary course, seeing new customers and maintaining old ones. Skuraton conceded that the contract did not require defendant to guarantee a level of business at closing; he claimed, however, that he understood "ordinary course" as meaning that defendant would continue servicing existing accounts and would also actively seek new business.
Milton Gold said that he understood the phrase "ordinary course of business" as meaning that defendant would continue to do business as it had done over the preceding 50 years. Defendant was to continue selling and buying drums, soliciting customers and dealers and keeping abreast of what its competitors were doing pricewise. Sol Gold's understanding was in accord with this.
*256 After plaintiff's agreement to purchase defendant was announced, some of defendant's dealers left it. Sol Gold speculated that customers left because they wanted to be sure they had a place to have their work done after the sale was closed.
He stated that defendant infrequently picked up new customers; the nature of the business was "continual repeat." Usually, negotiations were conducted at the end of the year for blanket orders covering six months to a year of the customer's needs. Milton Gold estimated that in 1981 defendant had approximately 76 customers, and that between January 1 and March 1, 1982 it had 60 active customers.
Throughout 1981 orders for reconditioned drums had dwindled, and there was a reduction in defendant's business of approximately 30 to 35 percent from December 1981 to March 1982. While the economy had declined tremendously from the preceding year, defendant determined that it had done well compared to many competitors since its major competitor had suffered a 50 percent reduction.
Milton Gold also testified that December was historically a bad month. Defendant closed down for two weeks in December for a union vacation period. Despite this, defendant had solicited new customers in December 1981 and January and February 1982.
Although the agreement set closing for March 2, 1982, at the offices of counsel for plaintiff in Newark, the closing was not held then. Instead, the parties appeared for closing on March 9 at the National State Bank in Elizabeth which was prepared to finance the sale. Skuraton was present on behalf of plaintiff. He had requested that defendant bring to the closing dollar amounts and units for December 1981 and January and February 1982 because he wanted to make sure that defendant's business "was still there." Comparing figures for that period and the preceding three-month period, Skuraton found that defendant's business had dropped between 40 and 50 percent. *257 He decided that he wanted to talk with his partners before closing "because the deal had changed dramatically."
Skuraton determined to not close because of the drop in defendant's business, but he did not inform the Golds why he would not close. Milton Gold testified that Skuraton said the bank would not lend plaintiff the money because of defendant's sales figures. Approximately a week after the deal failed to close the $50,000 on deposit was released to defendant.
Between December 1, 1981 and March 2, 1982 the drum industry had experienced a decline due to economic conditions. Plaintiff's own sales had dropped four or five percent. Between December 1981 and the time fixed for closing defendant's staff was substantially unchanged; only two or three plant workers were laid off.
Defendant closed its plant on March 1 and by March 19, 1982 had released 41 people. It had arranged to have its work performed at Bayonne Barrel, previously, one of its competitors. Nine months to a year later, defendant's plant on South Street in Newark reopened as Kearney Drum. It eventually sold off its assets. Open-head drums were sold to Kearney Steel and Drum for $300,000, and the equipment for bunk-type drums was sold for approximately $56,000. Sol Gold was unable to estimate what plaintiff's failure to complete the sale had cost defendant.
Milton Gold speculated that if the contract had not been aborted defendant could probably have gotten back much of its business lost after plaintiff's purchase was announced. He estimated that plaintiff's failure to consummate the agreement cost defendant $200,000 to $250,000.
In his oral opinion, the trial judge first found that during the four months prior to execution of the contract defendant's sales showed a gradual decline in volume and that it was entirely credible that once the announcement of the sale had been made the downturn became more dramatic. He found that between the contract signing and the time set for closing sales volume *258 increased some $40,000. This refuted plaintiff's contention that defendant had failed to continue to operate its business in the ordinary course. The judge therefore found that plaintiff had not borne its burden of establishing that defendant's acts entitled plaintiff to refuse to close. With regard to the enforceability of the liquidated damage clause the court held:
In the instant case the parties did, in fact, negotiate through attorneys at arms length [sic] a liquidated damage clause. Given the fact that a substantial portion of the value of the property being conveyed by good will [sic] of the defendant corporation, its name and its customer list, the difficulty of establishing damages by admissible evidence in reference to those items is readily seen. I can only conclude that the liquidated damage clause was a proper and reasonable result of good faith negotiation, not only to establish the damages of the defendant in the event of the breach but was also to limit the liability of the plaintiff.
I would also conclude that the reason for the failure to close is because the sellers  I mean the purchasers had a change of heart.
Relying upon, among other arguments, this court's decision in Utica Mut. Ins. Co. v. DiDonato, 187 N.J. Super. 30 (App. Div. 1982), plaintiff maintains that a liquidated damage clause is presumptively invalid as a penalty. To overcome that presumption the party advocating the clause must show that (1) it is a reasonable forecast of the harm caused by a breach and (2) the harm is incapable or difficult of accurate estimation. Plaintiff acknowledges that courts have split in determining which party has the burden of proof with regard to the enforceability of such clauses, but argues that defendant should have the burden because it had access to evidence about whether it was difficult to estimate damages and whether the forecast was reasonable.
Plaintiff argues that defendant failed to meet this burden of proof since there was no evidence that the $50,000 sum represented a good-faith effort to estimate the actual damages that would ensue from a breach. Further, the court was without evidentiary basis to find that it was difficult to establish damages. Plaintiff says that there was no evidence at all showing that defendant had sustained any loss as a result of plaintiff's failure to close.
*259 Defendant argues that a party is not required to prove "with mathematical precision" its damages in order to invoke a liquidated damage clause. It says that there is sufficient credible evidence in the record to uphold the trial judge's decision. To require direct evidence that "an inventory of potential damages was developed prior to execution of the agreement" would create an unprecedented standard of proof in this type of case. Here an inference can be made that the clause was a reasonable attempt to estimate damages; it was a voluntary, arm's-length commercial transaction between parties of equal bargaining power. Defendant agrees with the judge's finding that the nature of some of the items included in the purchase agreement  goodwill in the form of the company name and customer lists  made calculation of damages inherently difficult.
Defendant also argues that plaintiff's contention that this type of clause should be construed as a penalty is contrary "to the modern enlightened trend concerning this doctrine." It argues that courts have moved away from the belief that liquidated damage clause are presumptively invalid as penalties toward enforcing the clauses unless they are unreasonable, unconscionable or the product of grossly unequal bargaining power. It is defendant's position that the burden of proof should be placed upon the party attempting to avoid enforcement of the clause.
There are not many decisions in this State which deal in depth with liquidated damage clauses. Only Utica, supra, 187 N.J. Super. 30, which we discuss hereafter, specifically addresses, albeit briefly, the burden of proof issue.
Plaintiff's attorney drafted the contract which provided that $50,000 would be plaintiff's deposit and which stipulated that that sum would be lost in the event plaintiff failed to close. At trial plaintiff took the position that the sum was arbitrary and not the result of any attempt to forecast damages.
Generally, a liquidated damage clause is enforceable in New Jersey where actual damages which would be sustained *260 upon a breach are difficult to project and are not readily susceptible of proof under the rules of evidence. The agreed-upon sum must not, however, be disproportionate to the presumable loss. See Summit v. Morris Traction Co., 85 N.J.L. 193, 195 (E. & A. 1913). Accord Suburban Gas Co. v. Mollica, 131 N.J.L. 61, 63 (Sup.Ct. 1943).
In Suburban Gas plaintiff was a distributor of bottled gas. Defendant had agreed to purchase from plaintiff all the gas that defendant required for a period of three years. A minimum monthly charge of $1.15 was set. A clause in the contract set damages at $2.00 per month for all unexpired months of the agreement, the agreement saying that the loss which would arise from breach would be difficult to determine. Plaintiff sued for breach and recovered liquidated damages. On appeal defendant argued that the court should have awarded nominal damages only since plaintiff had failed to prove actual damages and that the trial court should have construed the clause as a penalty.
The appellate court upheld the trial judge, finding that plaintiff had been unwilling to assume the expense of installing pipes and other equipment on defendant's premises without the security of a contract for exclusive sales for a reasonable period and without a formula for fixing damages in the event of breach. 131 N.J.L. at 63. Further, the amount specified as liquidated damages was not exhorbitant, excessive or unconscionable considering the nature of the contract, the monthly minimum charge, and the proofs as to the quantity of gas sold during the life of the contract.
A liquidated damage clause was upheld in D.H.M. Industries v. Central Port Warehouse, 127 N.J. Super. 499 (App.Div. 1973), aff'd o.b. 64 N.J. 548 (1974). There, pursuant to contract, plaintiff erected a 500,000 square foot warehouse which was to be leased to defendant for a 20-year term at $43,750 per month, for a total rental of $10,500,000. Plaintiff sued defendant for *261 anticipatory breach when defendant refused to take possession and recovered $126,525, the stipulated liquidated damage sum.
In affirming, this court observed that the modern tendency was to look favorably upon agreements to fix specified amounts as damages in the event of a breach and to prefer to consider them as liquidated damage clauses rather than penalties. 127 N.J. Super. at 503. We found the clause an honest attempt to fix just compensation for losses which would be incurred upon a breach because (1) the contract involved a 20-year lease of a specially-constructed building with a gross rental of $10,500,000, (2) the security posted represented about one percent of the gross rental, (3) if the breach occurred the ability to obtain another suitable tenant for the building within a short time at a comparable rental rate and term was questionable, the expenses necessary to find a new tenant would be difficult to estimate and (4) plaintiff's actual damages were not disproportionate to the security posted. 127 N.J. Super. at 504.
In another context, clauses limiting contractual liability have been upheld. See Abel Holding Co. v. American Dist. Telegraph Co., 138 N.J. Super. 137, 160 (Law Div. 1975), aff'd 147 N.J. Super. 263 (App.Div. 1977) (clause limiting contractual liability to 10 percent of an annual service charge enforceable since it did not violate the public interest and was not unconscionable because the parties had been in equal bargaining position); see also Foont-Freedenfeld v. Electro-Protective, 126 N.J. Super. 254, 258 (App.Div. 1973), aff'd o.b. 64 N.J. 197 (1974) (clause limiting defendant's liability to 10 percent of annual service charge was upheld on the finding that the parties had been in equal bargaining positions and plaintiff had voluntarily entered into the contract with full knowledge of the clause and its effect).
Where, however, one party to a transaction is a consumer, the courts have taken a more protective stance. Thus, in Westmount Country Club v. Kameny, 82 N.J. Super. 200, 206 (App.Div. 1964), where doubt existed about whether the provision *262 in an application for a club membership saying that there would be no reduction or apportionment of annual membership fees if the member withdrew during the membership year was a liquidated damage clause, the provision would be constructed as a penalty.
In Spialter v. Testa, 162 N.J. Super. 421 (Cty.Ct. 1978), aff'd o.b. 171 N.J. Super. 181 (App.Div. 1979), certif. den. 82 N.J. 300 (1980), the court found that a lease covenant violated defendants' common law contract rights since it amounted to a penalty. There, the residential lease called for a variable percentage payment to the landlord in the event of the tenant's early unilateral termination.
In the real estate sales context courts have upheld the retention of deposit monies by the seller where the buyer has breached. In Oliver v. Lawson, 92 N.J. Super. 331 (App.Div. 1966), certif. den. 48 N.J. 574 (1967), plaintiffs individual and corporation breached a contract to buy land for $215,000. On appeal from the trial court's refusal to award the return of a $20,000 deposit, plaintiffs argued that defendants' retention of the sum would amount to a forfeiture. They also argued that defendants had been unjustly enriched since they made a new contract to sell the property at substantially the same price.
This court observed that the contract did not contain a forfeiture provision, citing as established law that where a buyer defaults he may not recover his deposit irrespective of the seller's actual damages and regardless of whether the contract contains a forfeiture provision. 92 N.J. Super. at 333-334. While one measure of damages for a buyer's breach of contract to purchase real property may be the difference between the contract price and the fair market value at the time of the breach, the seller was not bound to this remedy. 92 N.J. Super. at 335-336. See also Centex Homes Corp. v. Boag, 128 N.J. Super. 385, 394 (Ch.Div. 1974), where the court enforced a clause which limited the sellers of an apartment unit to the sum that buyers had paid before breach of the agreement. *263 More recently, in Ruane Development Corp. v. Cullere, 134 N.J. Super. 245 (App.Div. 1975), we upheld seller's retention of a $17,000 deposit on a $175,000 contract to sell undeveloped property where defendant-purchaser refused to consummate the deal.
Both parties here cite Utica, supra, 187 N.J. Super. 30. There defendant State of New Jersey had entered into contract with Colino Electrical Contractors under which Colino agreed to perform certain electrical work on a construction project. Utica was surety on Colino's performance and completion bond. Colino defaulted on the contract and Utica was compelled to complete performance.
Utica sued the State, asserting that agents and employees of the State had intentionally and in bad faith disbursed payments to Colino for work that was not completed and that, despite notice of business improprieties and defaults of Colino, had not only failed to notify Utica but also reduced the retainages on Colino's payments. The State denied liability and asserted a counterclaim seeking liquidated damages for Utica's failure to complete the contract within the time allowed. The trial judge dismissed plaintiff's complaint and awarded the State liquidated damages on the counterclaim.
The Colino contract had provided that in the event it failed to complete its work within the time stated in its proposal the contractor would be liable to the State for $25 per day or one-twentieth of one percent of the total consideration for one day, until the work was completed.
This court noted that the trial judge had made no finding of whether a portion of the delay was the fault of the State or another contractor. 187 N.J. Super. at 41. The State had made no attempt to prove its entitlement to liquidated damages other than to rely on a claimed late completion date. The trial judge had found that plaintiff had offered no proof on the counterclaim but simply alleged that the delays had been caused by the State. We commented:

*264 We assume this refers to a failure on the part of Utica to produce proof on that issue. This suggests that the trial judge assumed the burden of proof was on Utica to prove that the State caused or contributed to the delays in order to avoid the imposition of liquidated damages. We disagree that that is so, both as a general rule and under the facts of this case. In General Ins. Co. of America v. Commerce Hyatt House, 5 Cal. App.3d 460, 85 Cal. Rptr. 317 (D.Ct.App. 1970), the general rule was stated to be as follows:
It is well established that where the owners seek liquidated damages pursuant to the provisions of a contract, they must show that they have strictly complied with all requisites to the enforcement of that contractual provision. An owner whose acts have contributed substantially to the delayed performance of a construction contract may not recover liquidated damages on the basis of such delay. "Liquidated damages are a penalty not favored in equity and should be enforced only after he who seeks to enforce them has shown that he has strictly complied with the contractual requisite to such enforcement [citations]." (Aetna Cas., etc., Co. v. Bd. of Trustees, 223 Cal. App.2d 337, 340, 35 Cal. Rptr. 765, 767.) "The correct rule is that where such delays are occasioned by the mutual fault of the parties the court will not attempt to apportion them but will refuse to enforce the provision for liquidated damages." See also Kent v. United States, 343 F.2d 349, 351 (2 Cir.1965); Wunderlich Contracting Co. v. United States, 351 F.2d 956, 968, 173 Ct.Cl. 180 (1965).

We are not aware of any New Jersey cases that have discussed this precise issue, but we are satisfied these out-of state cases properly place the burden of proof upon the one seeking damages. [187 N.J. Super. at 42 (emphasis supplied)]
We found that we were unable to ascertain from the record or from the trial judge's opinion what standard the court had applied in determining liability for and assessing the amount of liquidated damages. We concluded, however, that "given the specific contract language involved here, the burden in the first instance is on the State to prove a valid liquidated damage clause and its entitlement to recover damages which are reasonable, considering the magnitude of the harm caused to the State." 187 N.J. Super. at 42-43 (emphasis supplied).
Similarly in Wassenaar v. Panos, 111 Wis.2d 518, 331 N.W.2d 357 (1983), the Wisconsin Supreme Court in a scholarly opinion discussing the competing philosophies generated by such clauses wrote:
Enforcement of stipulated damages clauses is urged because the clauses serve several purposes. The clauses allow the parties to control their exposure to risk by setting the payment for breach in advance. They avoid the uncertainty, *265 delay, and expense of using the judicial process to determine actual damages. They allow the parties to fashion a remedy consistent with economic efficiency in a competitive market, and they enable the parties to correct what the parties perceive to be inadequate judicial remedies by agreeing upon a formula which may include damage elements too uncertain or remote to be recovered under rules of damages applied by the courts. In addition to these policies specifically relating to stipulated damages clauses, the considerations of judicial economy and freedom of contract favor enforcement of stipulated damages clauses.
A competing set of policies disfavors stipulated damages clauses, and thus courts have not been willing to enforce stipulated damages clauses blindly without carefully scrutinizing them. Public law, not private law, ordinarily defines the remedies of the parties. Stipulated damages are an exception to this rule. Stipulated damages allow private parties to perform the judicial function of providing the remedy in breach of contract cases, namely, compensation of the nonbreaching party, and courts must ensure that the private remedy does not stray too far from the legal principle of allowing compensatory damages. Stipulated damages substantially in excess of injury may justify an inference of unfairness in bargaining or an objectionable in terrorem agreement to deter a party from breaching the contract, to secure performance, and punish the breaching party if the deterrent is ineffective. [331 N.W.2d 361-362]
The court held that where an employer sought to set aside a bargained-for stipulation of damages in an employment contract it was his burden to prove facts to justify nonenforcement of the clause:
Placing the burden of proof on the challenger is consistent with giving the nonbreaching party the advantage inherent in stipulated damages clauses of eliminating the need to prove damages, and with the general principle that the law assumes that bargains are enforceable and that the party asking the court to intervene to invalidate a bargain should demonstrate the justice of his or her position. [331 N.W.2d at 361; footnote omitted]
We conclude that in the context of commercial parties having comparable bargaining power, there should be presumptive validity of a liquidated damage clause. Such an approach is more consistent with judicial noninterference in private contractual matters where there is not significant disparity in economic advantage.
We agree with the trial judge that the record here supports a finding of arm's-length agreement. Plaintiff's attorney drafted the contract and plaintiff agreed to risk loss of $50,000. The parties were in closely related businesses. Plaintiff *266 sought the benefit from the elimination of a competitor. It might have expected that if it failed to complete its purchase, defendant would be severely affected. In fact, according to the Golds' testimony defendant lost customers after the sale was announced. Not to enforce the clause and place the burden of showing actual damage would, in our judgment, give plaintiff a better contract than it made.
This approach is not at variance with our decisions involving commercial parties. It certainly is not at variance with our holding in Utica, which dealt primarily with entitlement to invoke the liquidated damage clause.
Affirmed.