219 N.J. Super. 241 (1987)
530 A.2d 313
MONSEN ENGINEERING CO., PLAINTIFF,
v.
TAMI-GITHENS, INC., A NEW JERSEY CORPORATION, DEFENDANT-APPELLANT, THE HOUSING AUTHORITY OF THE CITY OF JERSEY CITY, A MUNICIPAL CORPORATION, THIRD-PARTY DEFENDANT-RESPONDENT,
v.
INSURANCE COMPANY OF NORTH AMERICA, A CORPORATION OF PENNSYLVANIA, THIRD-PARTY DEFENDANT, AND OHIO CASUALTY INSURANCE CO., A CORPORATION OF OHIO, THIRD-PARTY DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued June 3, 1987.
Decided June 29, 1987.
*242 Before Judges FURMAN, DREIER and SHEBELL.
Jack Jay Wind argued the cause for appellants Tami-Githens, Inc. and Ohio Casualty Insurance Co. (Margulies, Margulies & Wind, Attorneys; Mr. Wind, on the brief).
*243 Spencer N. Miller argued the cause for respondent (Miller & Galdieri, Attorneys; Mr. Miller, of counsel and on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
Defendant Tami-Githens Inc. and its surety Ohio Casualty Insurance Co. have appealed from a Law Division decision in favor of the Jersey City Housing Authority (Authority) in a breach of contract action. The Authority has cross-appealed from a ruling limiting it to the liquidated damage provisions in its contract.
This case involves a contract for the installation of a computerized zone-controlled energy management system in a public housing complex. Plaintiff, Monsen Engineering Co. (Monsen), a sub-contractor of Tami-Githens, originally asserted causes of action against both Tami-Githens and the Housing Authority for breach of contract, violations of the municipal mechanics lien law, wrongful appropriation, conversion and unjust enrichment. Monsen settled with Tami-Githens, and its complaint against the Authority was dismissed by an order that also limited the Authority to recovery against Tami-Githens of the liquidated damages specified in the prime contract. After an eight-day trial, the court entered final judgment in favor of the Authority and against Tami-Githens and its surety in the amount of $160,000 pursuant to the liquidated damage clause.
The energy management system installed by Tami-Githens was to provide automated heating control throughout an extended multi-building public housing complex by the use of telemetric remote temperature sensors linked by computer and mechanical components. Sensors were to be located in five dwelling units per building and would communicate the data by means of the existing 110 volt electrical wiring to a data processor located in each building which also would be wired to various other sensors in the heating system. The building data *244 processor would control and monitor the heating system of the particular building and then would be wired underground to a Centrex unit located in each of seven central boiler rooms. The Centrex units would be themselves linked over telephone lines to the main system computer located in the Authority's central office. Centrex units would also be monitored by black and white video cameras with the main system in the computer office.
The contract was awarded in April 1982 at a contract price in excess of $1,000,000. Work changes by Tami-Githens required a written change order from the Authority and the work was to be completed within 150 days. The contract contained a liquidated damage clause by which Tami-Githens agreed to pay to the Authority "liquidated damages (it being impossible to determine the actual damages occasioned by the delay)" of $200 for each calendar day of delay beyond the 150 days allowed for completion. The completion time was designated an essential condition of the contract. Performance commenced on April 28, 1982. Based upon this date, the contract should have been completed September 25, 1982. The contract was not considered substantially completed until December 31, 1984.[1] The total time of the delay less permissible extensions amounted to 800 calendar days.[2]
*245 Under the contract Tami-Githens was "fully responsible" for the installation of the overall system and was presumed familiar with "the plans and contract documents (including all addenda)." Electrical and mechanical products specifications were detailed in the contract. Specifically, each building was to be furnished with five "[p]ortable remote room temperature sensors," with specific instructions for their installation. Tami-Githens was further responsible "to provide a complete and operating installation as described by the plans and specifications."
On April 26, 1982, Tami-Githens subcontracted with Monsen for the computer and electrical requirements at a subcontract price of approximately $412,000. Although Monsen was aware that Tami-Githens' contract with the Authority called for telemetric sensors, the subcontract stated that there had been included a price of $20,000 "for hard wiring of room sensors to satisfy the contract documents." It was further provided that if the hard wiring could be eliminated by substitution of telephone lines, the savings was to be divided equally between Monsen and Tami-Githens.
There appeared to be a bona fide dispute as to whether or not the remote sensors were available in the market as of the date of the contract. Monsen allegedly had asked an Authority official about such availability and was told that the official had seen something about remote sensors in a magazine. Consistent with its subcontract, Monsen recommended telephone wiring for the sensors, but the Authority found this proposal "totally absurd" in light of the base contract's specifications and projected additional costs for wiring. This occasioned several months of delay while the Authority and Monsen sought a source of remote sensors. In October 1982, Authority *246 officials located a manufacturer of the sensors which had been on the market at least since January 1982, and the manufacturer provided the Authority with demonstrations in December 1982 and January 1983 after which the majority of the Authority concluded that the technology was feasible and available at the time of contract. Monsen, however, replied to the Authority's demand by stating that the remote sensors were incompatible with the building data processing units that Monsen had already procured and, since Monsen was a licensed distributor of the manufacturer, the data processing units' manufacturer's approval was needed to change the equipment. The Authority proceeded to perform on-site tests and determined that the sensors were compatible with the data processing units, and in March 1983 Monsen conceded the suitability of the telemetric sensors and offered the Authority alternative plans.
Tami-Githens, however, insisted that the telemetric option would require an additional cost of $150,000 and that the system was an "extra," since it was not available at the time of the original contract. After further negotiations, the Authority and Tami-Githens agreed to forego the telemetric sensors in favor of hard wiring. They memorialized their agreement in Change Order No. 5 which expressly provided for no changes either in contract price or time. The Authority accepted this compromise to facilitate the completion of the contract, although Monsen still required six to eight months thereafter to complete the work required by the Change Order.[3]
As to the other four Change Orders Nos. 1 through 4, they allowed in total time extensions of 27 days. At no time had Tami-Githens requested additional time extensions even for the *247 myriad of other problems that developed on the job alleged by the Authority to have been the responsibility of either Tami-Githens or Monsen. Tami-Githens submitted no progress schedules or delay itemizations to the Authority. One of its principals made one telephone call only to attempt to resolve the delay relating to the telemetric sensors and admitted his lack of any interest or concern in time extensions under the contract.
Judge McLaughlin issued a pretrial ruling that Monsen (and thus Tami-Githens) had the burden to prove the entitlement to relief from the liquidated damage clause under the contract. After an extended discussion, this was apparently accepted by Tami-Githens' attorneys who appeared to take no issue with this ruling. In a written opinion, the judge also limited the Authority to the liquidated damages provided in the contract. At the close of the trial, the court found that the telemetric sensors were available in 1982 at the time of the contract, that the Authority had done all it was required to do under the contract and that the delay resulted from the
almost single minded purpose [of Monsen] to substitute a telephone line system that would result in an additional savings to the contractor of $20,000, which was not to be passed on to the ultimate consumer.
The judge remarked that he did not
understand how a contractor could enter a bid to install [the sensors] without having any information as to the cost of these remote sensors or [their] availability.
Accordingly, Judge McLaughlin held the contractor liable for the delay and the Authority entitled to its liquidated damages.
On appeal, Tami-Githens contends that the trial judge erred in his allocation of burden of proof concerning the claims for liquidated damages, that Change Order 5 was a compromise and settlement of all matters existing up to that date including the delays already occasioned, and that the factual finding of the availability of remote temperature sensors suitable to satisfy the contract specifications was unsupported by substantial credible evidence. On its cross-appeal, the Housing Authority contends that it should have been permitted to prove its actual *248 damages and should not have been limited to the liquidated damage provisions of the contract.

I
In Central Steel Drum Co. v. Gold Cooperage Inc., 200 N.J. Super. 251, 259 (App.Div.), certif. den. 101 N.J. 303 (1985), we observed that there were "not many decisions in this State which deal in depth with liquidated damage clauses." The burden of proof issue was, however, reviewed in Utica Mut. Ins. Co. v. DiDonato, 187 N.J. Super. 30, 42-43 (App.Div. 1982), where the court required a party seeking liquidated damages to bear the double burden of proving
a valid liquidated damage clause and [the party's] entitlement to recover damages which are reasonable, considering the magnitude of the harm caused.
Utica Mutual, however, failed to cite or follow the principles established in Ferber Construction Co. v. Hasbrouck Heights, 90 N.J.L. 193 (E. & A. 1916), a case factually similar to the one before this court. In Ferber, a contractor retained to construct two school buildings completed performance after the scheduled date, allegedly because of extra work agreed upon under the contract. The contractor sued for the balance of the total price and was met with a counterclaim under the liquidated damage clause for delay. Defendant contended that the contractor had presented no written notice nor received any written extension from defendant's agent. The trial court directed a verdict for the full amount claimed by the contractor, but on review the Court of Errors and Appeals concluded that
it is quite clear that the defendant was entitled to some part of its counterclaim, unless it appeared that the time for completion had been extended. [90 N.J.L. at 195].
The Court held:
Now, it having appeared that there was a delay in performance, the burden of proving that the delayed performance was caused by the neglect or default of the defendant, and that a timely claim for an extension was made in conformity with the contract provisions, was upon the plaintiff. [Id. at 196].
In Utica Mut. Ins. Co. v. DiDonato, supra, the award of liquidated damages was reversed on the basis that the trial *249 judge required the contractor's surety to "produce proof" of defendant's delay and that the trial judge had assumed that the burden of proof was on the contractor to prove that the defendant caused or contributed to the delay in order to avoid the court's imposition of liquidated damages. The court stated: "We disagree that is so, both as a general rule and under the facts of this case." 187 N.J. Super. at 42. The court then adopted a general rule:
It is well established that where the owners seek liquidated damages pursuant to the provisions of a contract, they must show that they have strictly complied with all requisites to the enforcement of that contractual provision. An owner whose acts have contributed substantially to the delayed performance of a construction contract may not recover liquidated damages on the basis of such delay. [Ibid. (quoting General Ins. Co. of America v. Commerce Hyatt House, 5 Cal. App.3d 460, 85 Cal. Rptr. 317 (D.Ct.App. 1970))].
We note that the Utica Mut. Ins. Co. court made no reference to Ferber Construction Co. v. Hasbrouck Heights, supra, and in fact stated that "[w]e are not aware of any New Jersey cases that have discussed this precise issue...." Ibid. As a result, Utica Mut. Ins. Co. effectively placed the burden of proving the negation of a contractor's claim on the defendant contractee as part of its claim for liquidated damages.
We must take issue with this conclusion on two bases. First, we are bound by the Ferber Construction Co. decision as that of the former highest court of this state. Second, the Ferber principle is in accord with the weight of national authority. See, e.g., Wassenaar v. Panos, 111 Wis.2d 518, 331 N.W.2d 357 (1983) (cited with approval in Central Steel Drum v. Gold Cooperage Inc., supra, 200 N.J. Super. at 265); Housing Authority v. Forcum-Lannom, Inc., 248 Ark. 750, 454 S.W.2d 101, 102-106 (1970); L.A. Reynolds Co. v. State Highway Comm'n, 271 N.C. 40, 155 S.E.2d 473, 482-483 (1967). This authority is persuasive, since it recognizes that a challenge to a liquidated damage clause is basically an affirmative defense, and we see no justifiable reason to depart from the usual rule that

*250 the party who has the burden of pleading a fact will have the burdens of producing evidence and of persuading the [factfinder] of its existence as well. [McCormick, Evidence, § 337 at 948 (1984)].
See Evid.R. 1(4) and Current Rules of Evidence, Comments 1 and 2 to Evid.R. 1(4).[4]
We must, therefore, disagree with the views of our colleagues expressed in Utica Mut. Ins. Co. v. DiDonato, and here determine, following Ferber Construction Co., that Judge McLaughlin properly allocated the burden of proof. In the context of this commercial case with parties of comparable bargaining power, the Authority had the burden of proving no more than the existence of a valid liquidated damage clause, and the extent of the performance delay. The trial judge properly required Tami-Githens to offer proof of contractually acceptable excuses in order to avoid the application of the liquidated damage clause.[5]

II
Tami-Githens asserts that Change Order No. 5, relating to the alteration of the sensors specifications, constituted a settlement of all claims preceding its date and, therefore, only *251 subsequent time delays should be considered. The Change Order itself, however, explicitly provided that "the contract time is not changed," and "the aforementioned change, and work affected thereby, are subject to all contract stipulations and covenants." The Change Order was signed by both the Authority and Tami-Githens; and in each prior Change Order where a change in the contract time was intended, it was explicitly indicated. We, therefore, find no basis to disturb the rational conclusion of the trial judge that there were 800 net calendar days of delay.

III
Judge McLaughlin also factually determined that remote telemetric sensors were available at the time of the contract. Visits by representatives of the Authority to a site with an operating telemetric system as well as the various demonstrations of the system rebutted Tami-Githens' allegations that the units were unavailable and merely experimental. While Tami-Githens argues that the expansion of the system to a multi-building operation had not been shown to be feasible, it had the responsibility to be familiar with the contract specifications and inquire as to any changes before it accepted the contract. It not only failed in this regard, but was shown to have subcontracted the work without reference to the explicit contract specifications.
Considering the proofs as a whole and giving deference to the trial court's ability to assess credibility, we also find no basis to upset Judge McLaughlin's factual determinations on this issue. Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 484 (1974).

IV
The Authority's cross-appeal requires an extrapolation of the principles enunciated in Central Steel Drum Co. v. Gold Cooperage Inc., supra, 200 N.J. Super. at 259-260, that liquidated *252 damage clauses are enforceable where actual damages are difficult to project and not readily susceptible to proof under the rules of evidence, and providing that the sum imposed is "not disproportionate to the presumable loss." There, the actual damages were asserted by the defendant to have been far less than those under contract provisions; here, the Authority claims substantially higher damages.
A liquidated damage clause is unenforceable if it operates as an "in terrorem" provision to penalize or punish the breaching party. Westmount Country Club v. Kameny, 82 N.J. Super. 200, 206 (App.Div. 1964). Where the fixed sum is a reasonable forecast of just compensation that is incapable of or difficult to assess accurately, liquidated damage clauses are both enforceable and favored in the law. D.H.M. Indus. v. Central Port Warehouses, 127 N.J. Super. 499, 503 (App.Div. 1973), aff'd 64 N.J. 548 (1974); Barr & Sons, Inc. v. Cherry Hill Center, Inc., 90 N.J. Super. 358, 376-377 (App.Div. 1966). What follows logically from the element of "presumable" loss is that liquidated damage clauses "are to be judged as of the time of making the contract," and are not defeated by proof "that the damages suffered are shown to be less than the damages contracted for...." D.H.M. Indus. v. Central Port Warehouses, 127 N.J. Super. at 503-504 (quoting Priebe & Sons v. United States, 332 U.S. 407, 411-412, 68 S.Ct. 123, 126, 92 L.Ed. 32, 38 (1947)).
Although both Central Steel Drum and D.H.M. Industries involve situations where the actual damages were shown to be less than the liquidated damages, there is no reason that the principles there expressed should not be as equally applicable to cases where the actual damages are later shown to exceed the contractual liquidated damages. This court noted in Central Steel Drum that "in the context of commercial parties having comparable bargaining power, there should be presumptive validity of a liquidated damage clause." 200 N.J. Super. at 265. It would do as much violence to this *253 principle for the clause to be avoided in favor of the contractee as the contractor. In both situations, the test of disproportionality is to be applied to the presumable loss at the time of the making of the contract, not the actual loss (here estimated by the Authority at $544 per day).[6] Judge McLaughlin in his comprehensive written opinion of December 17, 1985 limited the Authority to its liquidated damages after stating a sufficient foundation to apply the Central Steel Drum rationale. We concur with his determination.
The judgment appealed from is affirmed.
NOTES
[1] Work remained to be done at the time of argument, and the Housing Authority has made no final acceptance, but the parties accepted the December 31, 1984 date for the purpose of this litigation.
[2] Exceptions to the time requirements under the contract were to be made when delays were

due to unforeseeable causes beyond the control and without the fault or negligence of the Contractor, including but not restricted to acts of God, or of the public enemy, acts of Government, acts of Owner, fires, floods, epidemic, quarantine restrictions, strikes, freight embargoes, and unusually severe weather or delays of subcontractors due to such causes, if the Contractor shall within 10 days from the beginning of such delay ... notify the Contracting Officer in writing of the causes of the delay. The Contracting Officer shall ascertain the facts and the extent of delay, the [Local Housing Authority] shall, subject to the prior approval of HUD, extend the time for completing the work when in its judgment the findings of fact of the Contracting Officer justify such an extension, and his findings of fact thereon shall be final and conclusive upon the parties to this contract.
[3] Among other difficulties which plagued this project were a three-month delay for the installation of the cable already purchased by the Authority, problems relating to the telephone line installations, substantial delays caused by flooding and sewerage backup, a two-week steamfitters strike and a variety of other problems relating to equipment error or failure, many of which were the outcome of Monsen's work.
[4] As the Supreme Court noted in Romano v. Kimmelman, 96 N.J. 66, 89 (1984), "the burden of proof can vary depending upon the type of proceedings, the comparative interests of the parties, the relative litigational strengths or weaknesses of the parties, the access of the parties to proof, and the objectives to be served by the evidence in the context of the particular proceeding." These considerations, however, are inapplicable to the case before us.
[5] Tami-Githens did attempt to prove that flooding and sewerage back-up at the Lafayette Housing Project had prevented completion of the contract so that even if the work had been performed by Tami-Githens at the other sites, they could not have completed the contract before May or June of 1984. The proofs reveal, however, that by mutual agreement between the Authority and Tami-Githens, the Lafayette Project was the last building that the Authority repaired since there was ample work for Tami-Githens to perform elsewhere. At the time the Lafayette Project was ready for wiring Tami-Githens had completed only 75% of the work on the other buildings. This delay, therefore, provided no basis for a successful challenge to the application of the liquidated damage clause.
[6] We see no impediment to a contract which could have provided the injured party with the alternative remedies of liquidated damages or any greater actual damages warranted by the proofs. Since this alternative was not included in the contract here, we will enforce the parties' agreement as written.