**E.F. COE t/a Cabana Motel, Plaintiff,**

**v.**

**THERMASOL, LTD., Defendant.**

**No. ST–C–82–134.**

United States District Court,
W.D. North Carolina,
Statesville Division.

July 31, 1985.

Anthony S. DiSanti, Finger, Watson, Di-Santi & McGee, Boone, N.C., for plaintiff.

Julia V. Jones, Moore, Van Allen, Allen & Thigpen, Charlotte, N.C., for defendant.

McMILLAN, District Judge.

This action came on for trial before the court, sitting without a jury, on June 10, 1985. By order filed July 5, 1985, the court dismissed plaintiff's complaint as time-barred by North Carolina statutes of limitations. The parties stipulated to the dismissal of the defendant's second counterclaim. The only claim before the court is defendant's first counterclaim.

After hearing the evidence and arguments of counsel and reviewing the record, the court finds as follows:

## FINDINGS OF FACT

1. Plaintiff is a resident of Watauga County, North Carolina, and is the owner and operator of the Cabana Motel in Boone, Watauga County, North Carolina.

2. Defendant is a New Jersey corporation which manufactures, installs and leases in-room steam bath and whirlpool equipment. Defendant has places of business in New Jersey and in California.

3. On or about January 20, 1978, plaintiff executed an agreement to lease from defendant forty-two steam bath units for use in plaintiff's Cabana Motel under a monthly rental plan based on the occupancy rate of the motel (the "1978 Lease"). Under the payment plan selected by plaintiff, plaintiff was required to make monthly lease payments for a total of 144 months.

4. On or about March 3, 1978, defendant accepted and executed the 1978 Lease in New Jersey and subsequently constructed and installed the forty-two ThermaSol steam bath units at plaintiff's motel.

5. The 1978 Lease provided at paragraph 14 that the lease would be enforced and interpreted in accordance with New Jersey law.

6. The 1978 Lease did not include wall liners, which are fiberglass moldings that fit over the walls of bathtubs and showers.

**318**

Plaintiff received the equipment called for under the 1978 Lease, and an agent of plaintiff signed an "equipment acceptance notice" that stated that the items described in the lease had been received.

7. On November 20, 1981, plaintiff executed a second lease agreement with defendant for the installation and lease of wall liners only (the "1981 Lease").

8. Defendant's subcontractor failed to install the wall liners in a timely fashion. Accordingly, defendant never invoiced plaintiff for payment under the 1981 Lease.

9. Defendant's failure to complete installation under the 1981 Lease is not a breach of the 1978 Lease.

10. Plaintiff made all payments due under the 1978 Lease through February 1982. In March, 1982, plaintiff stopped making payments under the 1978 Lease, thereby defaulting under paragraph 15 of the lease. Plaintiff has made no payment to defendant since February 1982.

11. The written contract between the parties, executed March 3, 1978, contained the following provisions which are pertinent to the controversy:

4. LESSEE MAY ELECT THE DAILY RENTAL, "PLAN A" OR THE DAILY OCCUPANCY RENTAL, "PLAN B" WHEN EXECUTING THIS LEASE. LESSEE WILL MAKE ITS ELECTION BY LESSEE INITIALLING ALONG SIDE EITHER "PLAN A" OR "PLAN B" IN THE INDICATED CIRCLE.

PLAN A—

Lessee will pay rent to Lessor for each ThermaSol Suite commencing as provided in paragraph 3, as follows:

(i) $1.10 per day, payable monthly, in advance, for months one through twenty-four, inclusive;

(ii) $1.25 per day, payable in advance, for months twenty-five through thirty-six, inclusive;

(iii) $1.75 per day, payable monthly, in advance, for months thirty-seven through 120, inclusive.

PLAN B—*

Lessee will pay rent to Lessor for each ThermaSol Suite commencing as provided in paragraph 3, as follows:

(i) $1.50 for each day that each ThermaSol Suite is occupied during months one through twenty-four, inclusive;

(ii) $1.75 for each day that each ThermaSol Suite is occupied during months twenty-five through thirty-six, inclusive;

(iii) $2.50 for each day that each ThermaSol Suite is occupied during months thirty-seven through 144, inclusive.

* Lessee will accurately complete the Monthly Occupancy Report forms supplied by Lessor and forward the completed Occupancy Report to Lessor by the seventh day of the following month. If less than 100% of the premises are ThermaSol Suites, then the monthly occupancy of each ThermaSol Suite will be not less than the monthly occupancy percentage of the premises, which shall not be less than 59% annually. ...

\*     \*     \*     \*     \*     \*

10. The rent payment, as herewith provided, shall be increased or decreased annually after December, 1978, by the percentage of increase or decrease in the Consumer Price Index published by the Bureau of Labor Statistics of the United States Department of Labor or any successor index, as reported for the City and State of New York (the "CPI"). All changes will be based upon the CPI for December of each year of the Lease term as compared to December, 1977. The change will be effective for the first day of the month following the month in which the report is issued and will remain in effect until the CPI is issued for the next December. In no event will the rent be less than that set forth in paragraph 4.

\*     \*     \*     \*     \*     \*

REMEDIES UPON THE HAPPENING OF AN EVENT OF DEFAULT

16. Upon the happening of any one or more of the foregoing events of default,

then Lessee, in addition to paying any arrears in rent and additional rent, late payment charges, the expenses of retaking possession and removal of the System, reasonable attorney's fees of 20% of the amount of any claim, court costs and expenses of disposing of the System, will pay Lessor the unpaid rent that would become due during the balance of the Lease term had Lessee elected the Daily Rental Plan, as set forth in paragraph 4A, after giving effect to rent rate changes as a consequence of the operation of paragraph 10, less all amounts realized by Lessor, if any, in Lessor's disposition of the System, after first deducting all expenses of such disposition.... Lessor may, if in Lessor's opinion the cost of removal and disposition would exceed the proceeds of disposition, elect not to remove and dispose of the System, and such election by Lessor shall not be a failure to mitigate damages, nor in any way entitle Lessee to a reduction in the amount due....

Plaintiff initialed the contract next to payment Plan B, indicating that his regular payments would be calculated according to the occupancy rate of each room and adjusted for inflation pursuant to paragraph 10. However, under the terms of paragraph 16, in the event of a default, defendant would recover from plaintiff liquidated damages based on payments under Plan A with adjustments for the CPI as provided in paragraphs 10 and 16. Under the liquidated damages clause, incorporating Plan A of paragraph 4, there is no variable for room occupancy. Application of the terms of paragraphs 4, 10 and 16 on the occasion of the default in March of 1982 results in principal damages in the amount of $242,-009.60 and attorney fees of 20% of the amount of principal damages, i.e. $48,-401.92.

12. Defendant did not make material misrepresentations of fact in inducing plaintiff to enter into the 1978 Lease.

13. Plaintiff, in entering into and performing under the 1978 Lease, did not rely on the alleged fact or assumption that wall liners were included in the 1978 Lease.

14. There was no evidence of a mutual mistake of fact by the parties with respect to the terms of the 1978 Lease.

15. Plaintiff is an experienced businessman. There is no evidence of unequal bargaining power in regard to the 1978 Lease.

## CONCLUSIONS OF LAW

1. The court has jurisdiction over the parties and over the subject matter based on diversity of citizenship, pursuant to 28 U.S.C. § 1332(a).

2. New Jersey law applies in the enforcement and interpretation of substantive provisions of the 1978 Lease, because the contract provides that New Jersey law applies, and the last act necessary to the contract (the execution of the contract by defendant), took place in New Jersey. *See, e.g., Tanglewood Land Company, Inc. v. Wood,* 40 N.C.App. 133, 252 S.E.2d 546 (1979); *International Harvester Credit Corp. v. Ricks,* 16 N.C.App. 491, 192 S.E.2d 707 (1972).

3. By order of July 5, 1983, this court dismissed plaintiff's complaint as time-barred by the North Carolina statutes of limitations. That order barred all claims for affirmative relief raised by plaintiff.

4. In March 1982 plaintiff defaulted under the terms of the 1978 Lease by nonpayment of rent.

5. Plaintiff has not established misrepresentation or fraud in defense to defendant's claim for damages under the 1978 Lease.

6. Plaintiff has not established mutual mistake in defense to defendant's claim for damages under the 1978 Lease.

7. Plaintiff has argued that the liquidated damages clause contained in paragraph 16 of the contract is unenforceable because it is a penalty. Under New Jersey law, which is applicable here, the court is to examine liquidated damages clauses to see if the amount fixed by the clause is a reasonable forecast of the harm

and if the harm caused is incapable or very difficult of accurate estimation. *Barr and Sons, Inc. v. Cherry Hill Center, Inc.*, 90 N.J.Super. 358, 217 A.2d 631 (App.Div. 1966). The reasonableness of the terms is to be judged by the circumstances at the time that the contract was made. *Suburban Gas Co. v. Mollica,* 21 N.J.Misc. 118, 32 A.2d 462, *aff'd.* 131 N.J.L. 61, 34 A.2d 892 (1943). In the context of commercial parties with comparable bargaining power, as here, there is a presumption of validity of the clause. *Central Steel Drum Company v. Gold Cooperage, Inc.,* 200 N.J.Super. 251, 491 A.2d 49 (App.Div.1985).

■ The liquidated damage clause here satisfies both of the tests above. Payment under the lease agreement was based on the occupancy rate of the rooms with adjustments for the inflation through use of the Consumer Price Index (CPI). Neither of these factors is capable of accurate advance prediction. The amount agreed in the signed lease is also reasonable as an estimate of damages. Calculations show that at the time of execution of the contract, the amounts due under this plan for the life of the lease, without any adjustment for inflation, would be between $417,742.50 (assuming a 100% occupancy rate) and $246,468.07 (assuming the minimum occupancy rate of 59% as provided for in the lease). At the time of execution, the liquidated damages clause would require, again with no consideration for inflation, $240,681.00 plus attorney fees. This figure is arrived at by calculating the lease payments under the optional Plan A of the lease that is based on a daily room rate without regard to occupancy. The amount due under the liquidated damages clause, along with attorney fees, would only be slightly above the minimum amount defendant would receive if the lease went to its conclusion. Therefore, the court concludes that the liquidated damages clause provided a reasonable forecast of the harm.

■ Under New Jersey law, plaintiff is still liable under this clause despite the presence of numerous acts that could lead to a breach and trigger application of the liquidated damages clause. The general rule that a liquidated damages clause is a penalty if applied to several independent covenants of varying importance does not apply under New Jersey law when the covenants are really interdependent and call for acts with one primary purpose. *Suburban Gas,* 32 A.2d at 465–68, *aff'd.* 34 A.2d 892 (1943) (citing 25 C.J.S., Damages § 111 at 1063 (1966)). *See, also, Borden Co., Pioneer Ice Cream Division v. Manley,* 127 N.J.L. 461, 23 A.2d 281 (1942). A liquidated damages clause triggered by a breach of any of numerous covenants was enforced in *Knutton v. Cofield,* 273 N.C. 355, 160 S.E.2d 29 (1968). The court is well aware that some jurisdictions refuse to enforce clauses that contain covenants of varying importance even if they all relate to one primary purpose. *See, e.g., Mayfield v. Hicks,* 575 S.W.2d 571 (Tex.Civ. App.1978); *Vernitron Corp. v. CF 48 Associates,* 104 A.D.2d 409, 478 N.Y.S.2d 933 (1984). A New Jersey court has explicitly rejected this approach in *Suburban Gas Co., supra.* This case has been cited as authority on other grounds as recently as this year. *Central Steel Drum Company v. Gold Cooperage, Inc., supra.*

The many covenants contained in the lease signed by plaintiff are all designed to further the primary purpose of leasing the steam bath units. They are inherently interrelated and are similar to the covenants in *Suburban Gas Co., supra.* Therefore, under New Jersey law the liquidated damages clause is enforceable despite the existence of numerous covenants, any one of which breached would allow defendant to receive liquidated damages.

■ The liquidated damages clause is also valid despite its provision that defendant may choose not to repossess the steam bath units upon default, but that if it does so, it must deduct from the damages under the clause the amount realized by disposition of the units. Because the steam bath units are costly to install and remove and may be of limited value once removed, it is not unreasonable for defendant to have the option of leaving the units installed, thus

giving plaintiff the benefit of his bargain, and collecting an amount reasonably calculated to estimate the damages. Had defendant chosen to remove the units, plaintiff would receive credit for the amount defendant realized from the units after the removal and could challenge the reasonableness of the disposition by the defendant.

■ Under the terms of the liquidated damages clause, defendant is entitled to all of the rent as calculated under Plan A of the 1978 Lease, with the CPI applied up to the date of breach. Plaintiff complains that the clause fails to provide for a reduction to the present value of the payments, some of which would not become due for many years. The 1978 Lease would require application of the CPI throughout the term of the lease. Under the liquidated damages clause the adjustment for inflation through the CPI ends at the date of breach. Therefore, although no reduction for present value of future payments is made, no upward adjustment is made for inflation. These two factors may not exactly cancel each other out, but the court finds that the clause, which provides for no reduction for present value and no adjustment for inflation, makes a reasonable estimate of the damages.

■ Defendant is entitled to recover under the liquidated damages clause the sum of $242,009.60 plus attorney fees. The lease provides for the payment of twenty percent (20%) as a reasonable attorney fee. New Jersey law applies to any question of attorney fees because the last act in forming the contract took place there. *Nytco Leasing, Inc. v. Dan—Cleve Corp.*, 31 N.C.App. 634, 230 S.E.2d 559 (1976). Therefore, the limitation under North Carolina law to fifteen percent (15%) of the amount due (N.C.G.S. § 6–21.2) does not apply. Under New Jersey law there is no set cap on the amount that the parties can contract for as attorney fees and "generally a contract which permits an aggrieved party to recover fixed or 'reasonable' attorney's fees as part of any damages is enforceable unless some larger public poli-

cy mandates a contrary result." *Center Grove Associates v. Hoerr*, 146 N.J.Super. 472, 370 A.2d 55 (App.Div.1977). Plaintiff has not presented any evidence that the percentage here violates public policy and the court does not so find. Therefore, defendant shall recover as a reasonable attorney fee twenty percent (20%) of the amount due, which is computed to be $48,401.92.

The court will enter a judgment in accordance with these findings of fact and conclusions of law.