838 A.2d 494 (2004)
365 N.J. Super. 120
EAST BRUNSWICK SEWERAGE AUTHORITY, a public body politic and corporation of the Township of East Brunswick, Plaintiffs-Appellants,
v.
EAST MILL ASSOCIATES, INC., A New Jersey limited partnership, Jack Whitman, individually and as general partner, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued December 3, 2003.
Decided January 2, 2004.
*495 Karl P. Kemm, North Brunswick, argued the cause for appellants (Philibosian, Russell, Killmurray & Kinneally, attorneys; Mr. Kemm and Christina E. Jones Rowe, on the brief).
James E. Stahl, North Brunswick, argued the cause for respondents (Borrus, Goldin, Foley, Vignuolo, Hyman & Stahl, attorneys; Mr. Stahl, on the brief).
Before Judges KING, LINTNER and LISA.
The opinion of the court was delivered by KING, P.J.A.D.
This case involves the allocation of costs associated with the upgrade of a sewer pumping station. The defendant, East Mills Associates (EMA), was developing residential units within the East Brunswick Sewerage Authority's (EBSA) service area. The sewer pumping system required an upgrade to accommodate the new units being built by the defendants.
In the developer's agreement, EMA agreed to pay 55% of the costs of the upgrade. Due to events unforeseen by both parties at the time of the agreement, the costs of the project increased substantially. EBSA sought reimbursement in accordance with the agreement. The trial judge held that EMA should not have to pay for the increased costs associated with the unforeseen events.
We conclude that the judge erred. In effect, he rewrote the contract of the parties. We reverse and direct entry of judgment for the full claim of EBSA, $340,022.12 plus interest.

I
EBSA and EMA entered into a developer's agreement on December 28, 1993 to upgrade the Ryder's Lane Pumping Station. EMA was building thirty-seven residential units located within EBSA's service area. Under the terms of the agreement, EMA was permitted to connect a maximum of eighteen units to the existing sewerage system. EMA could connect more units to the system with an EBSA engineer's approval. EBSA needed to expand and upgrade the existing pumping station to accommodate the additional units.
Pursuant to the agreement, EMA "agreed to pay for fifty-five percent (55%) of the total cost." The agreement stated in paragraph one:
Developer [EMA] shall pay to the EBSA... fifty-five percent (55%) of the costs and expenses incurred by the EBSA to upgrade the EBSA Ryders Lane Pumping Station which costs and expenses shall be inclusive of engineering, approval, design and construction costs and inclusive of approval costs as set forth in paragraph three of this Agreement. The EBSA shall be responsible for the difference of the Developer's contribution and total costs and expenses relating to the upgrade of the Ryder's Lane Pumping Station.
Paragraph three addressed the costs related to approvals or permits necessary for the pumping station improvements.
To the extent any costs are incurred in seeking approvals, permits and the like from any governmental entity having jurisdiction which are required for upgrading the EBSA Ryders Lane Pumping Station, such costs shall be borne by the EBSA and the Developer in the same percentage contribution as provided for in Paragraph 1 of this Agreement.
The schedule of payments mandated that EMA pay 55% of the engineering and design costs at the time of the bid award. Also, within ten days of the contractor's *496 request, EMA had to pay 55% of the engineering and design costs incurred since the prior payment in addition to 55% of the amount set forth in the contractor's request.
In 1993 the estimated cost to the defendant was $150,000 to $200,000. Although the construction was anticipated to begin in 1998, it did not actually begin until 2001. The reasons for the delay were threefold: (1) alterations because of Middlesex County's road-widening project on Ryders Lane; (2) a wetlands-encroachment application; and (3) a stream-encroachment application.
EBSA could not make the improvements to the pumping station until Middlesex County's road-widening project was complete. In the process, the entire site plan of the pumping station was revised because the widening of the road took property from the EBSA where the station was first located. The EBSA had approval from the planning board for the original design but had to obtain board approval for the new design.
EBSA's engineer for the project, Clifford Gold of C.G. Engineers, testified as a fact witness on the wetlands and stream-encroachment issues. Before the execution of the agreement, EBSA had obtained a letter of interpretation from the Department of Environmental Protection (DEP) delineating the property as wetlands. The letter of interpretation expired before EBSA started construction in 2001. Gold testified that even if the construction had proceeded in 1998 as anticipated, EBSA still needed to reapply to DEP.
A stream-encroachment application was also required for the project. Gold testified that even if the station had been built at its original location, a stream-encroachment application and review by the State would have been required. As these impediments to the projects arose, EBSA notified EMA of the status and the increased costs. EMA never responded.
On April 19, 2001 EBSA awarded the bid for the upgrade of the pump station to Estock Corporation t/a Middlesex Trenching in a bid amount of $449,898. Pursuant to the agreement, EBSA requested the posting of the security performance of $296,932.68 and 55% of the engineering and design costs up to that point of $88,880.87, or $48,884.48.
EMA did not make the payment or post bond. EBSA filed suit on November 1, 2001 for breach of contract demanding damages in accordance with the terms of the agreement, attorneys fees, costs of suit, plus interest. EBSA also alleged that EMA breached the agreement by connecting additional residential units to the existing sewer system without obtaining the necessary approval from EBSA. EBSA demanded 55% of $88,880.87 ($48,884.48), the engineering and design costs that were paid at the time of the bid award, and 55% of $618,222.03 ($340,022.12), the total costs which had accrued since the beginning of construction. The total reimbursement sought at the time of trial was 55% of $618,222.03 ($340,022.12), which includes 55% of $88,880.87 ($48,884.48) in engineering and design costs, and 55% of $529,341.16 ($291.137.64) in construction costs.
The case was tried on December 12 and 13, 2002. The judge ordered EMA to pay 55% of $88,880.87 ($48,884.48), the engineering and design costs incurred up to the time of the bid award pursuant to the letter of April 4, 2001, and 55% of $300,000 ($165,000), the estimate of construction costs EMA received from EBSA in the letter of July 29, 1998. The total awarded was $213,884.47. The trial judge observed that the estimates were given at different times, but the greater amount in engineering costs were awarded to compensate for EMA's failure to notify EBSA that they had connected additional homes. The judge deviated from the 55% contractual allocation of costs and divided the costs *497 associated with the unforeseen events in a manner he determined "fair [and] equitable." EBSA filed this appeal challenging the amount of the award. EBSA requests an award of $340,022.12, 55% of $618,222.03, the total amount spent on the project, excluding engineering and design costs.

II
In the developer's agreement, EMA agreed to pay "fifty-five percent (55%) of the total cost, including engineering, application, design and construction costs, to upgrade and expand the existing Ryders Lane Pumping Station owned by the EBSA based upon the terms and conditions set forth." Paragraphs one and three specifically addressed this allocation as it pertains to construction and approval costs. The agreement contained no other limiting or conditioning language.
Generally, contracts are given their plain and ordinary meaning. M.J. Paquet, Inc. v. N.J. Dept. of Transp., 171 N.J. 378, 396, 794 A.2d 141 (2002) (citing Nester v. O'Donnell, 301 N.J.Super. 198, 210, 693 A.2d 1214 (App.Div. 1997)). When the terms of a contract are clear, the court must enforce them as written. County of Morris v. Fauver, 153 N.J. 80, 103, 707 A.2d 958 (1998) (citing Koshliek v. Bd. of Chosen Freeholders of Passaic County, 144 N.J.Super. 336, 344, 365 A.2d 492 (Law Div.1976)). A court has no power to rewrite the contract of the parties by substituting a new or different provision from what is clearly expressed in the instrument. See Schenck v. HJI Assoc., 295 N.J.Super. 445, 450, 685 A.2d 481 (App. Div.1996), certif. denied, 149 N.J. 35, 692 A.2d 48 (1997); Tomaiuoli v. U.S. Fid. & Guar. Co., 75 N.J.Super. 192, 201, 182 A.2d 582 (App.Div.1962). It has been decided many times and in many cases that the court will not make a different or a better contract than the parties themselves have seen fit to enter into. Washington Construction Co. v. Spinella, 8 N.J. 212, 217, 84 A.2d 617 (1951).
However, courts of equity have the power not to enforce a contract that inequitably imposes a great hardship or a manifest injustice. See Brower v. Glen Wild Lake Co., 86 N.J.Super. 341, 350, 206 A.2d 899 (App.Div.), certif. denied, 44 N.J. 399, 209 A.2d 139 (1965).
In this case, the terms of the contract are clear; the judge must enforce them as written. The contract bound EMA to pay 55% of the total costs associated with the upgrade and expansion of the Ryders Lane Pumping Station. The additional costs relating to the road-widening project and the wetlands and stream-encroachment applications are part of the total costs. EBSA notified EMA of the increased costs in a timely fashion. EMA chose not to respond in any fashion to the notices regarding these increased costs.
The judge thought these events, the road-widening and the wetlands and stream-encroachment issues, were not "foreseeable by either party at the time when they entered into the developer's agreement." But this is not the test of contractual liability. Contract law frequently deals with future, contingent events. The parties to the contract here were fully capable of allocating costs for future events, either foreseeable or unanticipated, in their agreement. They could have capped the costs, reallocated cost over-runs, or required renegotiation. They did not do so. We must assume that the parties were satisfied with the cost allocation expressed in the agreement. See O'Brien (Newark) Cogeneration, Inc. v. Automatic Sprinkler Corp. of America, 361 N.J.Super. 264, 270, 825 A.2d 524 (App.Div.2003) (contractual provision relieving *498 seller of obligation to provide electricity where "unforeseeable causes beyond the reasonable control of and without the fault or negligence of [seller] ... which by exercise of due foresight such party could not reasonably have been expected to avoid); Monsen Engineering Co. v. Tami-Githens, Inc., 219 N.J.Super. 241, 244 n. 2, 530 A.2d 313 (App.Div.1987) (exception to time requirement for the installation of a computerized zone-controlled energy management system when delays are due to unforeseeable causes beyond the control and without the fault or negligence of the Contractor.") EMA and EBSA did not negotiate a clause regarding cost over-runs or unforeseeable events and the judge should not have supplied this additional term, not agreed upon by the parties.
We reject EMA's contention that the judge has discretion not to enforce this contract because it imposes a great hardship on EMA. See Weisbrod v. Lutz, 190 N.J.Super. 181, 186, 462 A.2d 610 (App. Div.1983); Brower, 86 N.J.Super. at 350, 206 A.2d 899; Giberson v. First Nat'l Bank of Spring Lake, 100 N.J. Eq. 502, 507, 136 A. 323 (Ch.1927). This argument is unpersuasive. The cases relied upon by EMA are inapplicable to this situation. In each of those cases, the remedy sought was specific enforcement. The judges in those cases decided that specific enforcement would impose an undue hardship on the party and monetary damages were awarded instead. Here the remedy sought is monetary only. We see no manifest injustice or great hardship in this case sufficient to justify relief from clearly expressed terms in the contract.
Experienced parties to these types of agreements, developers and public authorities, are well-equipped to express their intentions in clear contractual terms. We find that they did so here and reverse. EMA should pay $340,022.11 or 55% of $618,222.01, plus interest, and not $213,884.47.
Reversed for entry of judgment.