906 A.2d 476 (2006)
388 N.J. Super. 103
TOLL BROS., INC. and Laurel Creek, L.P., Plaintiffs-Appellants,
v.
BOARD OF CHOSEN FREEHOLDERS OF the COUNTY OF BURLINGTON and the Planning Board of the County of Burlington, Defendants-Respondents.
Toll Bros., Inc., and Laurel Creek, L.P., Plaintiffs-Appellants,
v.
Thomas R. Whitesell, Whitesell Enterprises, Whitesell Construction Company, Inc., Centerton Road, L.L.C., TRW Land, L.P., and The Planning Board of the Township of Mt. Laurel, Defendants-Respondents.
Toll Bros., Inc., and Laurel Creek, L.P., Plaintiffs-Appellants,
v.
Moorestown Township Planning Board and The Township of Moorestown, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued April 4, 2006.
Decided September 18, 2006.
*479 Carl S. Bisgaier argued the cause for appellants (Flaster/Greenberg, attorneys; Richard J. Hoff, Jr., Mr. Bisgaier and Frank H. Wisniewski, Cherry Hill, on the briefs).
Anthony T. Drollas, Jr., Trenton, argued the cause for respondents Board of Chosen Freeholders and Planning Board of the County of Burlington (Capehart Scatchard, attorneys; Mr. Drollas, on the brief).
*480 Mitchell A. Livingston argued the cause for respondents Thomas R. Whitesell, Whitesell Enterprises, Whitesell Construction Company, Inc., Centerton Road, L.L.C., and TRW Land (Sterns & Weinroth, attorneys; Mr. Livingston and Brian J. Mulligan, Trenton, on the brief).
Peter Thorndike, Cherry Hill, argued the cause for respondent Moorestown Township Planning Board (Ryan & Thorndike, attorneys, and Dennis P. Talty, attorney for Township of Moorestown; Mr. Thorndike and Mr. Talty, on the joint brief).
Christopher Norman argued the cause for respondent Mount Laurel Township Planning Board (Norman & Kingsbury, attorneys; Mr. Norman, on the brief).
Before Judges LEFELT, HOENS and SELTZER.
The opinion of the court was delivered by
LEFELT, J.A.D.
All three of these appeals,[1] which we have consolidated for purposes of decision, deal with whether plaintiff developer, Toll Brothers, Inc., should be bound by two agreements that it entered into with defendants Burlington County and Moorestown Township for the completion, at plaintiff's sole cost, of certain road improvements, which are now estimated at over $5,000,000. Also at issue is whether plaintiff has any contractual rights against defendant Whitesell, another developer, for more than Whitesell's pro-rata share of the road improvements, and whether the County and defendant Mount Laurel Planning Board violated any of plaintiff's rights by treating Whitesell more favorably with regard to the required road improvements.
The trial court resolved all of these issues by summary judgment against Toll Brothers and in favor of defendants Burlington County, Burlington County Planning Board, Moorestown Township, Moorestown Planning Board, Mount Laurel Planning Board, Thomas R. Whitesell, and various companies controlled by Whitesell.
To review a trial court's grant of summary judgment, we apply the same standard as the trial court. Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App.Div), certif. denied, 154 N.J. 608, 713 A.2d 499 (1998). In this case, therefore, we consider the record in a light most favorable to plaintiff to determine whether there were any genuine issues of material fact; and if there were none, whether the defendants were entitled to judgment as a matter of law. R. 4:46-2(c); Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). After completing our review in this fashion, we have concluded that plaintiff is bound by its agreement with the County, as the trial court correctly found, but that plaintiff's contract with Moorestown does not require the road improvements, specified therein, to be completed at this time. We decide all other issues against plaintiff and in favor of defendants. Consequently, we affirm in A-4814-03T5 and A-4816-03T5 and reverse and remand in A-6884-03T5.

I.
Because this dispute developed over a number of years, the facts are lengthy and *481 somewhat complex even though we summarize only those facts necessary to resolve the dispute. In the mid-1980's, defendant Whitesell established with three others the Moorestown Foursome. Foursome, with each of its members owning 25% of the newly formed entity, assembled approximately 540 contiguous acres in Moorestown and Mount Laurel Townships for a planned development to be known as Laurel Creek. The development was to include a golf course and country club, single family and townhouse residential units, retail property, and office space.
Separate from the land assembled by the Foursome upon which Laurel Creek was to be developed, Whitesell, through TRW Land, one of Whitesell's companies,[2] also owned an additional forty-seven acre tract adjacent to the proposed Laurel Creek development. On this separate tract, Whitesell intended to build approximately 500,000 square feet of office space.
The proposed site for the Laurel Creek development was roughly bordered by Creek Road on the north, Borton Landing Road on the west, Hartford Road on the south, and Centerton Road and Interstate Route 295 on the east. At that time, the site was rural with scattered homes and farms, with the exception of a service station at the northwest corner of Creek Road and Centerton Road.
Centerton Road, which runs north-south,[3] roughly parallel to I-295, is a two-lane municipal roadway without shoulders, curbs or sidewalks, except where it connects with I-295 at interchange 43 and widens to four lanes. Sections of the road run through Moorestown and Mount Laurel Townships, with Parker's Creek, which intersects the road, as the boundary line between the two townships. The southern section of the road in Moorestown, south of Laurel Creek, has been improved with a curbed grass median and two lanes in both the northbound and southbound directions. However, the northern section of the road, near the Laurel Creek development and the Winner Farm, which is east of Centerton Road and west of I-295, has not been improved and is currently only twenty-four feet wide with a single lane in each direction without shoulders.
In the Moorestown section of Laurel Creek, Foursome intended to build 470 dwelling units, the 18-hole golf course, and 1.2 million square feet of office space. The office space was to be built in phases 1A, 1B, 1C, and 2. Approximately 350,000 square feet of office space was planned for Phases 1A, 1B, and 1C, on the east side of Centerton Road, adjacent to Parker's Creek and the Whitesell tract on the north, and the Winner Farm on the south. Phase 2, containing 870,000 square feet of office space, was to be located on the west side of Centerton Road across from the Winner Farm and the Phase 1 property.
The Mount Laurel section of the development was to include a 25,000 to 30,000 square-foot clubhouse servicing the golf course and 47,000 square feet of retail space, which was described as "service oriented to take care of the residents in the area." Whitesell's forty-seven acre tract, which was to be developed as the Whitesell Office Park with 500,000 square feet of office space, was in Mount Laurel adjacent to and north of Laurel Creek's *482 Phases 1A-C, and east of the Laurel Creek Country Club and the proposed 47,000 square feet of retail space in Mount Laurel.
It quickly became obvious that the ambitious development would have a significant impact upon traffic in this rural area. A general consensus developed that Centerton Road should be realigned to come in at right angles to Creek Road, farther west of the I-295 interchange, and that the new realigned Centerton Road and Creek Road intersection should be signalized. In addition, various traffic improvement reports recommended several other road widening and traffic improvement projects in the vicinity of Laurel Creek.
Each of the land use approvals for the Laurel Creek development, obtained by Foursome from the Mount Laurel and Moorestown planning boards, required that Foursome also secure approval from the County Planning Board. Land use approvals granted to both Whitesell and Foursome by the Mount Laurel Planning Board, the Moorestown Planning Board, and the Burlington County Planning Board imposed conditions that the respective developers undertake the recommended roadway improvements at their cost.
In 1988, for example, the Mount Laurel Planning board specifically conditioned Foursome's preliminary subdivision plan on the County's approval of the relocation of the Centerton Road/Creek Road intersection, along with all necessary off-site improvements and that "until the intersection of Centerton Road and Creek Road is relocated, no building permit shall be issued which will permit more than 18% build out of the project." The Moorestown Planning Board and the County Planning Board both granted preliminary subdivision approvals conditioned on Foursome and Whitesell being responsible for roadway improvements, which at that time were estimated at approximately $2,000,000.
In 1990, Centerton Road became a proposed county road under the new master plan. Acceptance of the road by the County was dependent on the developers assuming responsibility for the realignment of the road and signalization at its intersection with Creek Road. Indeed, at no time during the course of this development has the County indicated any interest in having its taxpayers pay for any portion of the roadway improvements made necessary by the development.
In the early 1990's, a severe depression in the real estate industry derailed Whitesell's proposed office complex, and Foursome ran into financial difficulties precluding further development. At this time, Foursome had completed only the clubhouse, reduced to 24,000 square feet from an originally proposed 25,000-30,000 square feet, and the golf course, located in Mount Laurel and Moorestown. Neither Whitesell nor Foursome had executed any developer's agreement with the County, as required by the preliminary county approvals that had been previously issued.
Midlantic National Bank, which held the mortgage on Laurel Creek, instituted foreclosure proceedings against the defaulting Foursome. Plaintiff Toll Brothers, Inc. purchased Midlantic's mortgage on September 30, 1994 and on December 22, 1994 settled with Foursome. Pursuant to the settlement, sometime in early January 1995, Foursome transferred to plaintiff title to the Laurel Creek development and a substantial amount of cash. Included in the transfer were all contract rights and approvals that Foursome had obtained.
Upon acquiring title, plaintiff began working toward completion of the approval process for all phases of the development. On July 12, 1995, plaintiff entered into a *483 developer's agreement with the Burlington County Board of Chosen Freeholders. The agreement more clearly defined plaintiff's obligations under the prior approvals that had been given to Foursome. The agreement incorporated Foursome's obligation to complete, at its sole cost and expense, the Centerton Road/Creek Road improvements before any permit was issued for a building that would generate more than 18% of the projected traffic for the entire proposed development.
Following execution of the developer's agreement in June 1995, the County reiterated plaintiff's obligation to complete the Centerton Road realignment and intersection in a series of meetings, letters, and approvals related to plaintiff's plan for Phase 1 of its proposed office complex along Centerton Road in Moorestown. In fact, when plaintiff obtained conditional site plan approval from the County on April 27, 1999, for Phase 1A, a 75,000 square-foot office building, the County reiterated its understanding that plaintiff would be "100% responsible to realign Centerton Road."
At the time plaintiff obtained the County's approval for Phase 1A, plaintiff intended to construct in Phase 1B, a 110,000 square-foot office building, and in Phase 1C, a 155,000 square-foot office building. The Moorestown Planning Board, on October 28, 1999, granted plaintiff preliminary and final site plan approval for Phase 1A, and preliminary approval for Phases 1B and 1C. The resolution recited that, as part of the project, plaintiff "will be constructing road improvements to Centerton Road as detailed on the plans submitted."
The resolution further indicated, as condition sixteen, that the Centerton Road improvements "shall be the subject of a developer's agreement which shall spell out in detail the necessary construction methods ... to the satisfaction of the township's Engineer."[4]
Plaintiff eventually constructed the office building designated for Phase 1A and leased the structure to Comcast Cable. Plaintiff did not make the improvements required by the County to Centerton Road.
In November 2000, about the same time plaintiff applied to Moorestown for final site plan approval for Phases 1B and 1C, plaintiff contracted to purchase the Winner Farm. In conjunction with its application for final site plan approval for Phases 1B and 1C, plaintiff submitted "Concept Plan Section II" and "Concept Plan Section III" dated February 24, 2000, along with a narrative explaining the phasing of the Centerton Road improvements.
The Section II concept plan provided for the widening of Centerton Road from east of the Phase 1A site to a point approximately halfway between Phase 1A and its intersection with Hartford Road. The Section III concept plan provided for the widening of Centerton Road to four lanes through its intersection with Hartford Road. Section II was to be constructed as a condition of Phase 1B or 1C site improvements. Section III improvements were linked to Laurel Creek's development of Phase 2.
On January 23, 2001, the County conditionally approved the site plan for Phase 1B and 1C, again conditioned upon plaintiff's meeting its responsibility to complete the Centerton Road improvements. Plaintiff, however, postponed action on Phase 1C in anticipation of constructing one or *484 two buildings in Phase 2 before making major improvements to the Creek Road/ Centerton Road intersection. Phase 2, as originally designed, was to include 870,000 square-feet of office space.
Plaintiff had hoped to construct three 80,000 square-feet office buildings, in Phase 2, and lease them to Lockheed Martin before beginning the road improvements. However, plaintiff lost Lockheed Martin as a prospective tenant. Apparently, Lockheed Martin, for whatever reason, approached Whitesell to see if he could provide the required site and buildings. Lockheed Martin wanted to create a campus-like setting with a secure entry from Centerton Road, including a guard station, across from the Laurel Creek Country Club. Whitesell was willing and able to accommodate the company's needs.
On April 16, 2001, plaintiff entered into a developer's agreement with Moorestown Township. The agreement noted that the Moorestown Board had granted final approval for Phase 1A, that the Board had reviewed and considered plans for the "Toll Phase 2 Property" and that improvements to Centerton Road were to be phased in. The agreement specified that improvements for that portion of Centerton Road that is located within the Township were to be undertaken in two phases and that the "Phase 1 Centerton Road Improvements consist of those improvements necessitated as part of the Final Approval of Phase 1A and the improvements depicted on Concept Plan Section II. The improvements depicted on Concept Plan Section II shall be completed as a condition of the development of Phase 1B and/or Phase 1C of Phase 1." The Resolution further specified that "[t]he Phase 2 Centerton Road improvements are those improvements depicted on Concept Plan Section III. The Phase 2 Centerton Road Improvements shall be completed, if not previously completed, as a condition of the development of Phase 2."
Before executing its agreement with Moorestown, plaintiff and the Township had been discussing a zoning change for the Phase 2 property, where plaintiff wanted to build the Mews, a 122 unit age-restricted condominium development. Plaintiff wanted the Phase 2 property to be rezoned for age-restricted housing and proposed that the office zone that currently applied to the Phase 2 property be moved to the Winner Farm, which was residentially zoned, and which plaintiff was under contract to purchase. By November or December 2001, Moorestown had accepted these proposals and rezoned the Phase 2 property to a senior citizen residence district and placed the Winner Farm in a specially restricted commercial district.
On February 19, 2002, Whitesell applied to the Mount Laurel Board for concept plan approval for four office buildings to be built on its forty-seven-acre parcel. Lockheed Martin was committed to leasing the first two buildings with an option on the third. The Mount Laurel Board granted the concept approval on March 28, 2002, which provided the office park exclusive access to Centerton Road and did not permit access to the proposed signalized intersection for plaintiff's proposed retail development. According to plaintiff, the direct connection between these two parcels had been agreed since the 1980's, and was part of the reason plaintiff had acquired Laurel Creek.
During the site plan approval process for Whitesell's proposed construction, the Mount Laurel Planning Board noted that Whitesell's "fair share contribution responsibilities for Centerton Road/Creek road intersection shall be calculated by the [Burlington County Planning Board]." The Mount Laurel Planning Board's resolution *485 granting Whitesell final major subdivision approval recited that the County had jurisdiction over the Centerton Road improvements and that the Board would require Whitesell to contribute its pro-rata share.
At the hearing for final approval in 2002, plaintiff attempted to have the Mount Laurel Board's approval conditioned on Whitesell constructing the entire realignment of Centerton Road. The Board noted that pursuant to plaintiff's 1995 agreement with the County, the County had "jurisdiction over this application with respect to Creek Road improvements and may impose such requirements as the [County] deems appropriate." Thus, Mount Laurel required Whitesell "to contribute [only] its pro-rata share for the improvements associated with the [Centerton Road] realignment in Mount Laurel Township."
The County declined to condition its approval of Whitesell's office complex for Lockheed Martin on relocation of Centerton Road. Instead, it found that Whitesell's office complex would contribute 7.7% of the intersection traffic, and therefore Whitesell's contribution was estimated at $328,020, based on an estimated cost of improving the intersection of $4.26 million.
Plaintiff's plan to move the development initially proposed for Phase 2 across Centerton road to the Winner Farm was described as Phase 3. In March and April 2002, the Moorestown Board granted preliminary site plan approval for three 80,000 square foot office buildings and final approval for the first of those buildings to be built on the Winner Farm property. The three buildings were the first of a total of nine office buildings, as well as a bank, plaintiff planned for that site.
On July 16, 2002, plaintiff sued Whitesell, several of his development/construction companies, and the Mount Laurel Planning Board, alleging that Whitesell was obligated by its previous agreement to pay 25% of the cost of the Centerton Road improvements, and that the Mount Laurel Planning Board unlawfully discriminated between property owners by approving Whitesell's planned office park without allocating financial responsibility for improving Centerton Road.
In January 17, 2003, plaintiff sued the County defendants seeking a judgment declaring that the 1995 developer's agreement with the County was null and void or, alternatively, should be reformed to require plaintiff to pay only its pro-rata share of the cost of the Centerton Road improvements.
On January 23, 2003, the Moorestown Planning Board held its second hearing on plaintiff's application for preliminary and final site plan approval for the Phase 2 Mews, the 122-unit age-restricted condominium development. Both plaintiff's engineer and the Township's engineer agreed that the development would have minimal impact on Centerton Road. During the hearings, however, the Board, plaintiff's counsel, and various professionals debated the meaning and applicability of the Moorestown developer's agreement.
The Board's staff interpreted the developer's agreement as requiring the Centerton Road improvements to be made in connection with the construction of the Mews. Plaintiff's counsel represented that it made no sense, from a land use perspective, to require improvements along the entire length of Centerton Road as a condition of constructing the Mews. Counsel suggested that the road improvements should be completed as the Winner Farm Complex was built, since that would generate the need for the Centerton Road improvements.
Plaintiff's engineer, William Ommundsen, testified at the hearing before *486 the Board regarding the Mews approval that the Centerton Road improvements were to be done in three phases. Work had been completed on the first phase, in connection with the Comcast building on Phase 1A. The second section would be constructed when either Phase 1B or Phase 1C was built. The third section would be completed as plaintiff proceeded with the construction of the office complex on the Winner Farm, also known as Phase 3. At the hearing, plaintiff did not have a tenant for the proposed Phase 3.
An individual who owned one of the four homes on this area of Centerton road agreed, saying that he saw "no reason to change Centerton road from a nice country road to a four-lane boulevard if the office buildings are never built." He suggested that the Board require that Centerton Road be widened up to the Mews, but leave the remainder as it was until the office buildings are actually constructed. Plaintiff did not oppose widening Centerton Road between the driveway entrance into the country club and the first of two proposed access points along Centerton Road into the Mews, a span approximating 500 feet.
A March 6, 2003 Moorestown Board resolution approved the Mews on condition that plaintiff "construct all improvements to Centerton and Hartford Roads as depicted on plans submitted and approved by the Township Engineer," in accordance with the April 16, 2001, developer's agreement. The Board instructed that the improvements must be completed before issuance of construction permits for the proposed buildings, with the exception of those buildings to be utilized as model units.
On March 21, 2003, plaintiff filed a complaint in lieu of prerogative writs challenging, in relevant part, the condition in the Moorestown Board's site plan and subdivision approval of the Mews requiring compliance with the developer's agreement to make the improvements to Centerton Road.
On April 24, 2003, the County denied plaintiff's application for site plan approval for additional buildings on Phase 3, and reiterated that plaintiff must comply with the 1995 Developer's Agreement, between plaintiff and the County, to realign Centerton Road. In May 2003, plaintiff's contract to purchase the Winner Farm terminated and, by 2004, the County had decided to acquire a portion of the Farm for open space purposes.
As of today, the Laurel Creek development remains substantially reduced from the original conception. The development currently contains an 18-hole golf course, which was constructed as originally proposed and approved. Instead of the approved 25,000 to 30,000 square foot clubhouse, a 24,000 square-foot clubhouse was built. Of 470 proposed residential units, 460 have been constructed. Of the originally approved 47,000 square feet of retail space, plaintiff now proposes only 30,000 square feet. While 330,000 square feet of office space had been approved for Phase 1, only 74,400 square feet has been constructed, which houses Comcast Cable. For Phase 2, 870,000 square feet of office space had been approved, but in lieu thereof, plaintiff has had approved 122 age-qualified residential units. It is this substantial reduction in Laurel Creek's scale that plaintiff alleges buttresses and supports the numerous arguments advanced in these three appeals.

II.
We address plaintiff's arguments pertaining to the County and Moorestown in parts II A, B, and C, followed by plaintiff's *487 arguments regarding Whitesell and Mount Laurel in parts III and IV, respectively.

A.
We begin with some general principles regarding a developer's payment for off-tract improvements. A developer's legal obligation to pay for off-tract improvements as a condition of subdivision or site plan approval is limited to the "pro-rata share of the cost of providing only reasonable and necessary street improvements. . . located off-tract but necessitated or required by construction or improvements within such subdivision or development." N.J.S.A. 40:55D-42. The "plain meaning and obvious legislative intent was to limit municipal authority only to improvements the need for which arose as a direct consequence of the particular subdivision or development under review." N.J. Builders Ass'n v. Mayor & Twp. Comm. of Bernards Twp., 108 N.J. 223, 237, 528 A.2d 555 (1987).
A county planning board having jurisdiction over subdivisions and site plans may also compel those road improvements deemed necessary by the county engineer for the safety and convenience of the traveling public. N.J.S.A. 40:27-6.2(c)(subdivisions); N.J.S.A. 40:27-6.6(c)(site plans). See Builders League of S. Jersey, Inc. v. Burlington County Planning Bd., 353 N.J.Super. 4, 13-19, 801 A.2d 380 (App. Div.2002) (upholding county planning board's jurisdiction over subdivisions); Kode Harbor Dev. Assocs. v. County of Atlantic, 230 N.J.Super. 430, 438-41, 553 A.2d 858 (App.Div.1989) (interpreting N.J.S.A. 40:27-6.6 to mean "county planning board has jurisdiction to review site plans pertaining to properties which abut, front on, or border county roads or which affect county drainage facilities").
The same policy considerations that govern N.J.S.A. 40:55D-42, pertaining to townships, also apply to the powers conferred upon counties and county planning boards. Builders League, supra, 353 N.J.Super. at 23-25, 801 A.2d 380; Squires Gate, Inc. v. County of Monmouth, 247 N.J.Super. 1, 8, 588 A.2d 824 (App.Div.1991). Contribution toward improvements may be required when the improvement is made necessary by the development's impact upon the area. Id. at 8-9, 588 A.2d 824. While the amount of the contribution cannot be computed with mathematical certainty, a developer may not be saddled with a disproportionate share of the cost of the improvement. See F & W Assocs. v. County of Somerset, 276 N.J.Super., 519, 529, 648 A.2d 482 (App. Div.1994); Vrabel v. Mayor and Council of the Borough of Sayreville, 253 N.J.Super. 109, 118-19, 601 A.2d 229 (App.Div.1992).
Thus, absent the agreements, neither the County nor Moorestown Township could require plaintiff to pay the entire cost of the Centerton Road improvements, since an exaction of that magnitude would be significantly greater than the need for the improvements generated by the reduced scope of the proposed development. Accordingly, we move on to evaluate the trial court's summary judgment concluding that both agreements were valid and binding upon plaintiff.

B.
There are several undisputed material facts pertaining to the agreements. See Brill, supra, 142 N.J. at 540, 666 A.2d 146. It is undisputed that plaintiff executed both agreements voluntarily and knowingly; and, with regard to the 1995 agreement with the County, reaffirmed that agreement on several occasions until plaintiff decided not to exercise its option to build offices on the Winner Farm. In addition, with regard to that agreement, it is *488 undisputed that the 18% threshold has been or is about to be reached. It is also undisputed that plaintiff no longer has any contract right to purchase the Winner Farm and that, in 1988 and in 1989, Foursome recognized that it would be contributing more than its pro-rata share of the cost of off-site traffic improvements.
The Municipal Land Use Law mentions developers' agreements only once, stating that such agreements may be included in a general development plan for a planned development. N.J.S.A. 40:55D-45.2(l). Nevertheless, William M. Cox and Donald M. Ross, in New Jersey Zoning and Land Use Administration § 34-8.2(c) at 776 (Gann 2006), have noted that "the practice of entering into developer's agreements is now so common and so desirable that it has not, to the author's knowledge, been questioned."
Plaintiff does not question the viability, usefulness, or legality of developers' agreements in general. Instead, plaintiff seems to argue that every developer's agreement that incorporates a promise to pay more than its pro-rata share is void as contrary to public policy, especially when the development's scope is reduced after the execution of the agreement. We reject the breadth of this argument and decline to invalidate an agreement where the developer voluntarily offers to install certain improvements over and above what could be required under N.J.S.A. 40:55D-42.
A developer's agreement may be invalidated if it clearly and directly contravenes an express legislative policy or is inconsistent with the public interest. See Briarglen II Condo. Ass'n, Inc. v. Twp. of Freehold, 330 N.J.Super. 345, 355, 749 A.2d 881 (App.Div.), certif. denied, 165 N.J. 489, 758 A.2d 648 (2000), overruled, in part, on other grounds by Ramapo River Reserve Homeowners Ass'n. v. Borough of Oakland, 186 N.J. 439, 896 A.2d 459 (2006). Courts may refuse to enforce agreements between private parties that violate public policy. See, e.g., Vasquez v. Glassboro Serv. Ass'n, 83 N.J. 86, 98, 415 A.2d 1156 (1980). When the agreement is between a private party and a public entity, the result is no different. For example, a developer's agreement in which a municipality grants significant zoning benefits in exchange for a contribution that a developer could not be compelled to pay may be invalid. Nunziato v. Planning Bd. of the Borough of Edgewater, 225 N.J.Super. 124, 133-34, 541 A.2d 1105 (App.Div.1988). Courts will void land use approvals where "the illegal exaction constitutes a blatant quid pro quo for the approval, either demanded by the municipality and acceded to by the developer or offered by the developer and accepted by the municipality in circumstances in which the exaction is unrelated to any legitimate land use concerns generated by the development application itself and the amount thereof is entirely arbitrary." Twp. of Marlboro v. Planning Bd. of Twp. of Holmdel, 279 N.J.Super. 638, 643, 653 A.2d 1183 (App.Div.), certif. denied, 141 N.J. 98, 660 A.2d 1196 (1995).
The conditions contained in the agreements between plaintiff and the County and plaintiff and Moorestown do not violate any zoning ordinances or require illegal conduct. In fact, the agreements further the public interest by seeking to achieve a legitimate land use objective, the building of road improvements, necessitated by the development, at the sole cost of the developer seeking to profit from the development. See Talcott Fromkin Freehold Assocs. v. Freehold Twp., 383 N.J.Super. 298, 313-14, 891 A.2d 690 (Law Div.2005). It is not illegal or illegitimate for municipal entities to try and protect their taxpayers from paying for improvements made necessary by commercial land developers. See Ramapo *489 River Reserve, supra, 186 N.J. at 443, 896 A.2d 459 (upholding a developer's agreement to maintain the development's roadways until the developer's control of the executive board of a homeowner's association terminates).
Plaintiff argues that if we assume that the development was substantially increased, instead of reduced, after the agreement, the injustice of the governing bodies' positions would be highlighted. Plaintiff specifically suggests that we assume, at the time of the agreement, plaintiff had proposed a 122-unit, age-restricted residential development and then later substituted for that development 800,000 square feet of office space. Undoubtedly, under such circumstances the County or a local planning board could require plaintiff to pay more in the way of off-site improvements. However, unlike the facts at issue, in this reverse scenario, the requirement to assess additional construction fees would not be inconsistent with the agreement plaintiff entered into with the County, where plaintiff agreed to construct the improvement when a certain level of traffic was reached.
This is particularly so when the history of this specific improvement is considered. The parties have always agreed that Centerton Road would need to be realigned and a new Centerton Road/Creek Road intersection installed once the traffic reached a specified level. Otherwise the I-295 off-ramp onto Creek Road would be impeded, traffic would become unduly congested, and the public safety impaired. The County never intended that any part of these improvements should be paid for by the taxpayers.
Plaintiff argues that by entering into the developer's agreement, the County and Moorestown Township have exceeded their authority and prevented the respective planning boards from performing their proper functions. Plaintiff relies on N.J.S.A. 40:55D-41, which authorizes governing bodies to adopt an ordinance establishing standards for off-tract improvements, and N.J.S.A. 40:55D-20, which provides that the powers exercised by planning boards and boards of adjustment may not be exercised by any other body. Twp. of Dover v. Bd. of Adj. of the Twp. of Dover, 158 N.J.Super. 401, 411-13, 386 A.2d 421 (App.Div.1978) (holding that a governing body lacks standing to contest a zoning board's variance grant except on the ground that the board exceeded its authority); see also, Twp. of N. Brunswick v. Zoning Bd. of Adj. of the Twp. of N. Brunswick, 378 N.J.Super. 485, 490-91, 876 A.2d 320 (App.Div.), certif. denied, 185 N.J. 266, 883 A.2d 1063 (2005); and N.J.S.A. 40:27-6.6 (authorizing county planning boards to impose off-tract obligations on developers).
We agree with plaintiff that one of the purposes of a developer's agreement with a municipality is to ensure that a developer properly completes whatever improvements are directed by the local board. We cannot agree, however, that a developer's promise to pay more than its fair share of such an improvement is always unenforceable. "[I]t would be totally inappropriate for a court to set aside" agreements that were not illegal or in violation of public policy solely because the developer voluntarily agreed to install improvements over and above what could be legally required by a developer. See Cox, supra, § 24-6 at 549. Similarly, it would be inappropriate for a planning board to effectively invalidate such an agreement by granting subdivision or site plan approval without insisting that the developer comply with the agreement. Just as a governing body may not interfere with the statutory duties of a planning board or zoning board, Twp. of Dover, supra, 158 N.J.Super. at 408-09, *490 386 A.2d 421, a planning board or zoning board would exceed its authority by annulling a contract between a governing body and a developer.
In short, while plaintiff attempts to structure this dispute as a conflict between the role of local planning agencies and municipal governing bodies, we conclude that basic contract principles control. When the terms of a contract are clear, as are plaintiff's agreements with the County and Moorestown, we will enforce the agreements as written. E. Brunswick Sewerage Auth. v. E. Mill Assocs., Inc., 365 N.J.Super. 120, 125, 838 A.2d 494 (App.Div.2004). We have no power to rewrite a contract or make a better contract for one of the parties. Ibid. "Experienced parties to these types of agreements, developers and public authorities, are well-equipped to express their intentions in clear contractual terms." Id. at 127, 838 A.2d 494. "The parties to the contract here were fully capable of allocating costs for future events, either foreseeable or unanticipated, in their agreement. They could have capped the cost, reallocated cost over-runs, or required renegotiation." Id. at 126, 838 A.2d 494. Just as in E. Brunswick, the parties here "did not do so." Ibid.
In support of its position to reform the agreements, plaintiff relies upon Allied Realty, Ltd. v. Borough of Upper Saddle River, 221 N.J.Super. 407, 534 A.2d 1019 (App.Div.1987), certif. denied, 110 N.J. 304, 540 A.2d 1284 (1988) (holding res judicata and collateral estoppel did not preclude the board from deciding whether changed conditions warranted subdivision approval and the release of a developer from a prior promise to leave the subject lot vacant), and River Vale Planning Bd. v. E & R Office Interiors, Inc., 241 N.J.Super. 391, 575 A.2d 55 (App.Div.1990) (releasing a developer that had abandoned a project from the obligations of a developer's agreement).
Neither Allied Realty nor River Vale support plaintiff's case against the County, but River Vale does advance plaintiff's position against Moorestown. Allied Realty is inapposite to both the County and Moorestown because it involved neither a developer's agreement nor a developer's obligation to finance a portion of the cost of off-tract improvements made necessary by the development. Had the County calculated plaintiff's fair share contribution based on the size of the development as initially proposed, Allied Realty would then require the County to recalculate the amount of that contribution based on the smaller development currently proposed.
In River Vale, the developer obtained conditional site plan approval and a parking variance based upon the execution of an agreement to undertake certain improvements. The original developer then abandoned its development plan and sold the property to another, who neither sought nor needed site plan approval or a variance. We concluded that neither developer was bound by the agreement. "[T]he installation of the improvements contemplated by the Developer's Agreement as a condition of site plan approval was subject to an implied or constructive condition that those improvements were required only if the developer proceeded with the project contemplated by the application and approval." Id. at 400, 575 A.2d 55.
River Vale is distinguished from plaintiff's claim against the County because in River Vale the municipality could rescind its site plan approval and variance, eliminating any prejudice to the township. Here the County would be prejudiced if plaintiff fails to make the improvements. The County cannot rescind the several subdivision and site plan approvals received *491 by plaintiff, since Laurel Creek already contains 460 homes, a golf course, a clubhouse, and a 75,000 square-foot office building.
Also, in River Vale, we relied on the contract law principle that performance by one party may be excused if an implied or constructive condition does not occur. Id. at 400-01, 575 A.2d 55. We imply contractual terms, however, only when they are "necessarily involved in the contractual relationship so that the parties must have intended them and have only failed to specifically express them because of sheer inadvertence or because the term was too obvious to need expression." Palisades Props., Inc. v. Brunetti, 44 N.J. 117, 130, 207 A.2d 522 (1965). This principle is an exception to the general rule that courts may not make a better contract for the parties, or supply terms that may not have been agreed upon. Graziano v. Grant, 326 N.J.Super. 328, 342, 741 A.2d 156 (App.Div.1999).
Here, plaintiff argues that we should imply a term that it need not make the required improvements if it unilaterally decides not to proceed with the development it originally contemplated, even though the development already in place may have reached the 18% threshold as contemplated in the agreement. The term that plaintiff asks the court to read into the contract is not one that was left out by sheer inadvertence or because it was too obvious to express. Rather, it was a term that plaintiff was free to negotiate.
In addition, the term plaintiff seeks to imply conflicts with the plain language of the County's agreement and with the parties' clear intent. The County relied on traffic studies showing that the Centerton Road improvement would have to be made once plaintiff built 18% of the development it had initially proposed. In the 1995 agreement, plaintiff unequivocally promised to be solely responsible for the improvements at issue, a promise which it reaffirmed on a number of occasions thereafter. Moreover, the improvements were never contemplated to be publicly financed. The construction was always proposed by private developers as a privately-funded construction project in order to comply with local planning and zoning requirements, and was always considered as such by the County. In addition, plaintiff has benefited from the agreement and its underlying development approvals, particularly where plaintiff was permitted to build over a period of time without concern over its development approvals expiring.
Finally, plaintiff argues that the County should be equitably estopped from enforcing the 1995 agreement because of its failure to impose a similar obligation on Whitesell. However, the County has never taken an inconsistent position in this matter, and plaintiff never relied on any inconsistent position, nor did it change its position for the worse based on any County action. The doctrine of equitable estoppel has no relevance to this appeal, County of Morris v. Fauver, 153 N.J. 80, 104, 707 A.2d 958 (1998) (explaining equitable estoppel is only applied against government entities to prevent manifest injustice or in very compelling circumstances), and the trial court correctly held on summary judgment that plaintiff was bound by its developer's agreement with the County and must build the Centerton Road improvements when Laurel Creek generates "greater than 18% of the projected traffic... for the entire [] development [proposed by Foursome and Whitesell in 1989]."

C.
We come to a different conclusion with regard to plaintiff's agreement with *492 Moorestown. In interpreting a contract, the court's goal is to ascertain the intent of the parties as revealed by the language used, the surrounding circumstances, and the purpose of the contract. The Bar on the Pier, Inc. v. Bassinder, 358 N.J.Super. 473, 482, 818 A.2d 424 (App.Div.), certif. denied, 177 N.J. 222, 827 A.2d 289 (2003). Plaintiff contends that the contract's intent was to apply to the office complex originally planned for Phase 2, not to the age-restricted residential community that plaintiff now seeks to construct.
Three months after plaintiff filed its complaint against the Township, plaintiff submitted a revised developer's agreement to the Township counsel. Plaintiff argued that the prior agreement contemplated the construction of over 800,000 square feet of office space on the Phase 2 property, but that property was now to be developed with a 122-unit age-restricted residential development that would generate virtually no traffic. Plaintiff urged the Township to execute the revised developer's agreement reflecting the traffic impact of plaintiff's revised development plans. The Township refused to consider any amendments or revisions of the agreement without further direction from the Superior Court, in view of the pending litigation.
Moorestown argued below, and in this appeal, that the plain language of the current agreement requires plaintiff to make the improvements when it develops the Phase 2 property for any purpose. There is no language in the agreement that conditions plaintiff's obligation upon the construction of the large-scale office complex that plaintiff initially proposed for the Phase 2 property. Since plaintiff's counsel drafted the agreement, one can only conclude the contract required the improvements for any development on the Phase 2 property. According to Moorestown, had the parties intended otherwise, plaintiff's counsel would have written the relevant contingency into the contract.
The trial court did not specifically address plaintiff's contention that the express terms of the contract applied only to an office development on the Phase 2 property, although it was argued at length. Instead the court concluded that this agreement arose solely out of the Phase 1 approvals, although it "might have impliedly contemplated a Phase 2 submission."
We disagree with this construction. In our view, the contract calls for the staged improvement of Centerton Road. The agreement requires the Section II portion of the road, roughly from Phase 1 south to Hartford Road, to be constructed "as part of the [Specially Restricted Industrial] SRI Phase 1B or 1C site improvements." Improvements for the Section III portion of the road, south of Hartford Road, "will be constructed as part of the SRI Phase 2 site improvements." The last sentence of paragraph one details the timing for the section III portion of Centerton Road. It states: "The Phase 2 Centerton Road improvements shall be completed, if not previously completed, as a condition of the development of Phase 2."
It is significant to us that the contract distinguishes between "Phase 2" and the "Toll Phase 2 Property." In fact, the first recital clause describes the "Toll Phase 2 Property." But the last sentence of the timing provision does not require completion of the improvements upon development of the Toll Phase 2 Property, but rather upon the "development of Phase 2." The eighth "whereas" clause refers to the development to be located on "Toll Phase 2 Property" as "Phase 2."
Although the developer's agreement was not signed until 2001, the language at issue was developed a year or so before when the Moorestown Board heard the application *493 for Phase 1A. At the time, Phase 2 called for 870,000 square feet of office space, and no one considered that the Phase 2 property might be rezoned for age-restricted residential use. At that time, Phase 2 may have, in concept, been moved across Centerton Road onto the Winner Farm property that plaintiff intended to purchase, but it seems relatively obvious to us that the parties intended "Phase 2" to refer to the specific planned development of office space.
Unlike the County's agreement, this agreement calls for staged improvements on Centerton Road as traffic-generating office complexes were built. To date, plaintiff has only constructed Phase 1A and some related improvements to Centerton Road. When plaintiff builds Phase 1B or 1C, it is obligated to complete those improvements included within the Section II Concept Plan. Therefore, even though plaintiff is not obligated to build the Section III Centerton Road improvements at this time, there has been no prejudice to the municipality.
Both the text and the purpose of this agreement differ from plaintiff's agreement with the County, which was to require needed road improvements once increased traffic reached a certain threshold. Here, plaintiff has apparently made those improvements necessitated by Phase 1A and Moorestown has not shown that a 122-unit age-restricted development would generate any need for additional improvements along that portion of Centerton Road within Moorestown Township. Consequently, not only does the language of the contract require this result, but River Vale appears to be on point and would impliedly condition this agreement upon the construction of the improvements which generated the need for the agreement. See River Vale, supra, 241 N.J.Super. at 400-01, 575 A.2d 55. Therefore, we reverse the trial court's grant of summary judgment in favor of Moorestown and remand that case for further proceedings. On the remand, the Moorestown Planning Board may not condition construction approval of the Mews upon completion of the Centerton and Hartford Road improvements.

III.
Plaintiff also argues that the trial court erred in concluding as a matter of law that Whitesell was not contractually obligated to contribute more than its pro-rata share of its cost of the Centerton Road improvements. Plaintiff asserts that it is unfair for it to be responsible for 100% of the costs of these improvements, while the County required Whitesell to pay only 7.7% of the cost of the Centerton Road improvements for the first phase of its office complex.
The trial court found "no support in the record ... to sustain any claim for damages for breach of contract by Whitesell as [plaintiff] was not a party to nor an anticipated third party beneficiary to any formal Whitesell agreement." Plaintiff claims that discovery could show an agreement between Foursome and TRW, one of Whitesell's company's, to equitably share the cost of the Centerton Road improvements, that the agreement survived plaintiff's acquisition of Foursome's interest in Laurel Creek, and that plaintiff's contract rights against TRW could be enforced against other enterprises owned or controlled by Whitesell.
Giving plaintiff the benefit of all favorable evidence and reasonable inferences to be drawn therefrom, there is little doubt that on March 21, 1989, TRW agreed with Foursome to share the total cost of constructing the Centerton Road improvements. However the terms of this agreement are open to debate. In addition, it is *494 an open question whether plaintiff, upon assuming Foursome's position, could, as Foursome's successor, enforce this agreement against TRW or Whitesell.
In any event, no amount of discovery could change the following facts. When plaintiff acquired Foursome's interests in 1994, it had a copy of all relevant documents that plaintiff now claims formed a contract enforceable against Whitesell. Despite possessing this information, plaintiff entered into a contract with the County a few months later. Plaintiff provided no notice to Whitesell and made no demand for contribution. In the contract with the County, plaintiff included no contingencies or any references to Whitesell or any other developer. Instead, plaintiff voluntarily agreed to be solely responsible for the Centerton Road improvements. By the time Whitesell applied to the County Planning Board for development approvals for the office park that currently exists on Whitesell's property, plaintiff had years earlier committed to building the Centerton Road improvements.
This conduct demonstrates that plaintiff understood that Whitesell no longer had a contractual duty to share in the cost of the improvements. Assuming whatever agreement between TRW and Foursome could be construed to impose a duty on Whitesell to contribute, plaintiff's conduct in 1995 and thereafter amounts to effectively waiving the 1989 agreement. This course of conduct must be accorded "controlling weight in determining a contract's interpretation." County of Morris v. Fauver, supra, 153 N.J. at 103, 707 A.2d 958. Therefore, whatever contract obligation Whitesell may have been under in 1989 was extinguished by 1995, and summary judgment was properly granted Whitesell.

IV.
Finally, plaintiff claims the Mount Laurel Planning Board deprived plaintiff of equal protection, substantive due process and or procedural due process by approving Whitesell's 400,000 square foot office complex without requiring Whitesell to shoulder more of the cost of the Centerton Road improvements.[5] Plaintiff seeks damages under 42 U.S.C.A. § 1983 and discovery to examine the Board's motives and justifications.
The Board, however, has done nothing wrong. It approved a development application that conformed to Mount Laurel's land use regulations and deferred to the County regarding the calculation and allocation of the Centerton Road/Creek Road intersection building costs. In short, plaintiff's claim against the Board lacks sufficient merit to warrant any further discussion, and summary judgment was properly granted to the Board.

V.
In conclusion, we have found the trial court correctly granted summary judgment to the County and properly rejected those arguments against Whitesell and Mount Laurel wherein plaintiff sought directly and indirectly to reduce its contractual obligation to construct the Centerton Road improvements. However, we have also found that the trial court incorrectly interpreted plaintiff's agreement with Moorestown Township and should not have awarded summary judgment to the Township. Accordingly, for the reasons explained above, we affirm the trial court in *495 A-4814-03T5 and in A-4816-03T5 and reverse in A-6884-03T5 and remand for further proceedings.
NOTES
[1] There are at least eight appeals involving the land development at issue herein. Many of the issues on appeal appear to be overlapping. In this appeal, we focus essentially on those issues relating to the developer's agreements to improve Centerton Road entered into by plaintiff with Burlington County and Moorestown Township and plaintiff's various attempts to compel Whitesell, another developer, to pay more than his pro-rata share of the road improvement costs.
[2] In addition to TRW Land, L.P., Whitesell also owns and controls Whitesell Moorestown Limited Partnership, and defendants Whitesell Enterprises; Whitesell Construction Company, Inc.; and Centerton Road, LLC.
[3] In the record, Centerton is also described as running east-west. However, for purposes of this opinion, we will describe the road as north-south, as the segment of the road at issue runs roughly north-south.
[4] The record does not contain the plans submitted in 1999 or the transcript of the hearing before the Moorestown Planning Board.
[5] We decide in other appeals, A-1248-04 and A-1247-4, also filed this date, plaintiff's claims regarding: (a) access between its proposed retail property and Whitesell's property, and (b) the Mount Laurel Planning Board's approval of additional country club parking spaces conditioned on Centerton Road improvements.